**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Joe Don LOONEY, Defendant-
Appellee.**

**No. 73-1171.**

United States Court of Appeals,
Fifth Circuit.

July 6, 1973.

Rehearing Denied July 31, 1973.

Roby Hadden, U. S. Atty., Dennis R. Lewis, Asst. U. S. Atty., Tyler, Tex., for plaintiff-appellant.

Michael Thornell, Houston, Tex., for defendant-appellee.

Before JOHN R. BROWN, Chief Judge, and COLEMAN and DYER, Circuit Judges.

DYER, Circuit Judge:

Looney was indicted for possession of an unregistered sub-machine gun within the definition of 26 U.S.C.A. § 5845(a) in violation of 26 U.S.C.A. §§ 5861(d) and 5871. From an order of the district court granting Looney's motion to suppress the gun as evidence because it was seized as a result of an illegal search the Government appeals. We reverse.

About 2:15 in the morning of April 5, 1972, five agents of the Bureau of Narcotics and Dangerous Drugs, for the purpose of executing an arrest warrant for Ronald Frick, went to the home of Don Looney, father of appellant Joe Don Looney. The house is located in a rural area in Diana, Texas. Based upon information Frick had given one of the arresting agents while the agent was acting in an undercover capacity, Frick was believed to be at the Looney residence. The agents neither had an arrest warrant for Joe Looney nor a search warrant for the residence.

The agents had previously been investigating Frick because of his discussion with two of them, acting undercover, about cocaine smuggling. They knew him to be an international smuggler and

had reason to believe that Frick possessed cocaine because he offered to give the agents a substantial discount on the purchase price. More importantly, he had agreed to pay them five thousand dollars to assassinate Federal Chief Judge Connally to keep him from sentencing Frick's girl friend for possession of cocaine. Frick thought that his girl friend would fare better before another judge. Frick had "cased Judge Connally's home" and knew of the Judge's comings and goings, as well as those of the gardener and maid. The arrest warrant for Frick had been obtained from a United States Magistrate for obstructing justice.

The agents believed Frick to be a very dangerous person. Coombs, who was in charge of the detail, advised the other four agents to be extremely careful. Two agents were sent to the rear of the house while Coombs and two other agents proceeded to the front door. Joe Looney answered a knock on the door. The agents identified themselves and asked Looney if Frick was there. After getting a negative response they entered the house and found Frick in a small study off the living room, hiding behind a book-shelf, next to which there were two loaded rifles. Frick was arrested, advised of his constitutional rights, and handcuffed. The agents saw a partially burned cigarette believed to be marihuana on the floor. As a result they arrested Looney, advised him of his constitutional rights and handcuffed him. In response to an agent's question whether there were any more narcotics in the house Looney said that there was some grass in the back bedroom and for the agents to help themselves.

Coombs felt precautionary measures were dictated for the personal safety of the agents because of their unfamiliarity with the house located in a rural area, the heinous nature of the crime for which Frick was arrested, Frick's known propensity for using confederates, and the lateness of the hour. He therefore directed that the house be cleared and thus prevent any possible harm to the

agents by making sure that the agents knew who was in the house and, if someone was found, whether he was armed. Accordingly, agent Bullard was directed to remain in the living room with Frick and Looney and agents Alexander and Clagg were sent to secure the two bedrooms and baths while Coombs and Harper went to the master bedroom portion to secure it. While proceeding with caution so that no one in the bedroom could cause the agents physical harm, Clagg looked through an open doorway from the hall into the front bedroom and saw, in plain view, the sub-machine gun on the floor under the bed. It was later established that the gun belonged to Joe Looney.

After finding the weapon and finding no one else in the house, a process which took no more than fifteen minutes from the time of entry, the house was then searched thoroughly without a warrant for about three hours. The Government does not assert that evidence seized after the termination of the cursory security search is admissible.

The district court in granting Looney's motion to suppress pointed out in its findings of fact that:

> The premises was [sic] immediately secured by the agents, that is, there were no weapons *within the reach of Frick or Looney.*
>
> .  .  .  . The bedroom *was out of the immediate control of both Frick and Looney.* (emphasis supplied).

Relying on Chimel v. California, 1969, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, the court in its conclusions of law found the search and seizure to be unlawful and unjustified:

> The weapon in question was found after both Frick and Defendant Looney were secured and a cursory search had been made *in the area subject to Frick's and Looney's immediate control.* (emphasis supplied).

Upon a careful consideration of the record, we are of the view that neither the revered principles of the Fourth Amendment nor the limitations of *Chi-*

*mel* are traduced by allowing officers to make a cursory security search to protect their lives under the circumstances here present. The district court dwelt on the fact that the area subject to Frick's and Looney's immediate control was secure. This misses the point. The important thing is that after Frick and Looney were made immobile the agents were instructed to look through the house for *people* that might be in hiding and be a danger to the safety of the agents, and not to look for *things*. Of course, once this security precaution had been taken, any further search without a warrant was prohibited.

It is manifest that here the agents were not "routinely searching any room other than that in which [the] arrest occurs;" *Chimel, supra* at 763, 89 S.Ct. at 2040. Indeed, the agents were not engaged in a Fourth Amendment search at all.

On almost parallel facts the Eighth Circuit recently found that there had been no unlawful seizure of a sawed-off shotgun found in plain view during a security search. United States v. Briddle, 8 Cir. 1970, 436 F.2d 4, cert. denied, 404 U.S. 942, 92 S.Ct. 291, 30 L.Ed.2d 256. We are in complete agreement with and adopt the views there expressed:

> The distinguishing and controlling fact, as we view the case before us, is that the shotgun was not discovered as a result of any search whatsoever. Rather, it was discovered by being in plain view in the bedroom which Special Agent Hancock entered in the exercise of his conceded right to conduct a quick and cursory viewing of the apartment area for the presence of other persons who might present a security risk. As stated in Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067, "It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." Thus, when Special Agent Hancock observed in plain view an illegally possessed sawed-off shotgun (contraband) he had the right to seize it, and in so doing he did not violate any fourth amendment right of Briddle. See, United States v. Baca, 417 F.2d 103 (10th Cir. 1969); Harris v. United States, supra.
>
> The policy reasons that support the application of an exclusionary rule as to evidence obtained in violation of fourth amendment rights by an illegal search and seizure are not present where the evidence is obtained without any search by being observed in plain view by an officer who concededly had a right to be where the observation occurred. Nor do we deem it to be necessary, advisable or in the public interest to declare that an unreasonable search occurring thereafter either under an invalid search warrant or by way of overbreadth and incidental to a lawful arrest taints and brings under the exclusionary rule contraband type evidence discovered and seized under the circumstances present in this case.
>
> . . . . Apparently the Court in *Chimel* did not have before it any contention that separate consideration should be given to items seized solely and properly incident to the arrest as distinguished from other items seized. More to the point, *Chimel,* is readily distinguishable on the facts. In *Chimel,* armed with an arrest warrant, the officers with Chimel's wife were waiting for him to come home. When he arrived home he was arrested under circumstances that did not occasion the officers to conduct a cursory viewing of the house premises concurrently with the arrest as a security measure. Nor is there any indication in *Chimel* that any of the challenged items had been in the plain view of any officer who at the time he saw the item was in a place where he had a right to be as a part of a concededly proper security check of the area where the arrest occurred.

*Id.* at 7, 8 (footnotes omitted).

Under the circumstances of this case the agents' search, not to discover evidence of crime, but to allow them to carry out the arrests of Frick and Looney without fear of violence, constituted a limited reasonable intrusion to insure their safety. *See* Adams v. Williams, 1972, 407 U.S. 143, 92 S.Ct. 1921, 32 L. Ed.2d 612. The sub-machine gun that was in plain view and seized as a result of this intrusion was therefore admissible, and Looney's motion to suppress it as evidence at his trial should have been denied.

REVERSED and REMANDED for further proceedings consistent with this opinion.