**UNITED STATES of America,**
**Plaintiff,**

v.

**Wayne Maurice JAMES, a/k/a Offoga Quadduss, et al., Defendants.**

**Crim. A. No. 4384–N.**

United States District Court,
S. D. Mississippi,
Jackson Division.

Aug. 14, 1973.

See also 5 Cir., 528 F.2d 999.

E. Donald Strange, James B. Tucker, Asst. U. S. Attys., Jackson, Miss., Garvin L. Oliver, Dept. of Justice, Crim. Div., Washington, D. C., for plaintiff.

Hermel Johnson, Jack H. Young, Jr., Jackson, Miss., Constance Iona Slaughter, Forest, Miss., Fred L. Banks, Jr., Firnist J. Alexander, Jr., Jackson, Miss., George M. Strickler, Jr., New Orleans, La., Raymond E. Willis, Detroit, Mich., for defendants.

## MEMORANDUM OPINION

### ON DEFENDANTS' MOTION TO SUPPRESS EVIDENCE

NIXON, District Judge.

The defendants have filed a Joint Motion to Suppress for Use as Evidence all property seized by law enforcement officers from 1148 Lewis Street and 1320 Lynch Street, Jackson, Mississippi and to require the return thereof pursuant to Rule 41(e), F.R.Crim.P., and to suppress all statements or answers given by the defendants. A full evidentiary hearing was held on this motion, and based upon all of the evidence adduced, this Court has reached its following findings and conclusions.

On the late evening of August 13, 1971, after regular business hours, a teletype message was received by the Federal Bureau of Investigation office in Jackson, Mississippi from the Detroit, Michigan Federal Bureau of Investigation office on the exclusive wire for FBI communications that on that date a complaint had been filed in Grand Rapids, Michigan charging one Jerry R. Steiner, also known as Sylee Lagondele Omos I, with violation of 18 U.S.C. § 1073, unlawful flight to avoid prosecution on a first degree murder charge and that an arrest warrant, a copy of which was enclosed, had been issued by United States District Judge Albert J. Engel, Grand Rapids, Michigan. Steiner was charged by the State of Michigan with the first

degree murder of a 17 year old service station attendant who was shot in the back of the head during a robbery of the station at which he was employed. A first degree murder warrant was outstanding against him on this state charge. The teletype also advised the FBI that Steiner had in the past resisted arrest on a desertion charge and should be considered extremely dangerous in view of this resistance and the first degree murder charge.

In mid-July, 1971, Special Agent George Holder of the Jackson, Mississippi office of the FBI had received information from an unrecalled source that Steiner was in Jackson, Mississippi and was later informed by a confidential informant "who had never been found to be unreliable" that on August 17, 1971 Steiner was present at 1148 Lewis Street in Jackson, the headquarters or provisional capitol of the Republic of New Africa (RNA) and there was no reason to believe he would soon be leaving that address. Agent Holder first knew that Steiner was a fugitive wanted for murder when he saw the teletype in FBI Headquarters on Monday morning, August 16, 1971, when that matter was assigned to him. The teletype also gave a detailed description of Steiner.

At the time the teletype was received and acted upon, the RNA was in the process of moving its "headquarters" or "capitol" from 1148 Lewis Street to 1320 Lynch Street in Jackson.

On the morning of August 16, Elmer F. Linberg, Acting Agent in Charge of the Jackson FBI office, read the above teletype and asked Jackson Police Chief Lavell Tullos for assistance from the Jackson Police in attempting to arrest Steiner, in view of the fact that Mr. Linberg knew that the Jackson Police had outstanding misdemeanor warrants for the arrest of three subjects reportedly residing at 1148 Lewis Street. The FBI and Jackson Police considered the RNA to be an extremist organization inasmuch as it proclaimed itself to be an independent nation, openly professed its intention to acquire all of the property which comprised five Southeastern States, had publicly held military-type drills with weapons, and had pointed weapons at police officers patrolling past 1148 Lewis Street. Furthermore, the defendant Richard Henry, a/k/a Imari Obadele, I, the president of the RNA was reported by the press in Jackson to have threatened to "wipe out the National Guard of Mississippi" and to set up a separate nation in the United States through the acquisition of five southern states.

On the afternoon of August 17, Agent Linberg met with Chief Tullos at approximately 4:30 p. m. at the latter's office in Jackson Police Headquarters and informed him of the unlawful flight warrant from Michigan for Steiner who was allegedly living at the Lewis Street address. At that time the Chief informed Mr. Linberg that the Jackson Police had misdemeanor arrest warrants for Jesse Nicholson, Henry Hatcher and one of the original defendants herein, Larry Jackson, a/k/a Karim and Brother Black, one of them having been charged with assault on a newspaper reporter at RNA headquarters. The Jackson Police would not have tried to serve these warrants because of the danger that service entailed if the FBI had not had the felony fugitive warrant and asked for their cooperation. Later in the evening of August 17, there was another meeting between Chief Tullos, Agent Linberg and approximately 30 to 35 other officers, all of whom were FBI agents with the exception of 12 who were Jackson policemen. At this meeting, strategy was mapped for attempting to execute the one felony and three misdemeanor arrest warrants at the Lewis and Lynch Street addresses. Approximately 12 policemen and 15 FBI agents were to participate in the attempted arrests at approximately 6:30 a. m. on August 18, 1971, some to be stationed outside the Lewis Street address and some outside the Lynch Street address. At this meeting, it was decided that the officers would be equipped with gas masks, two or three with tear gas guns and shells,

flak vests, sidearms, shot guns and helmets. None carried rifles or any automatic weapons. This 6:30 a. m. time, which was well after daylight, was decided upon since the members of RNA were considered by the police to be armed and dangerous and the federal fugitive, Steiner, was known to be armed and dangerous, and thus there was a real possibility of harm to passersby and neighbors.

In view of the foregoing facts and reliable information that armed guards were on duty at the Lewis and Lynch Street address 24 hours a day, the following plan of action was agreed upon to effect the desired arrests. No search warrant was requested nor obtained for the search of either the Lewis Street or Lynch Street premises.

Each agent and police officer was given a specific assignment and furnished a description of the four subjects. The plan for the apprehension was to place a police car with a flashing blue light in front of 1148 Lewis Street and to then advise the occupants by way of a bullhorn of the purpose of the the officers' presence and request all occupants to emerge from the building and identify themselves. If they did not come out within one minute, they were to be given an additional 15 seconds and told that if they were not out within that time tear gas would be fired into the rear part of the residence. If the fugitives were not located at 1148 Lewis Street, Mr. Linberg would give an order for agents and police at Lynch Street to immediately commence a similar operation.

In accordance with the prearranged plan, agents and officers took positions around the two buildings. At 6:30 a. m. the occupants of 1148 Lewis Street were advised over a bullhorn or megaphone by Special Agent Amann that FBI agents and officers of the Jackson Police Department had the residence complete-

ly surrounded; that the officers had warrants for the arrest of four occupants at that address; and that within 60 seconds all residents were to immediately surrender through the front door with their arms extended over their heads. After the first sixty second announcement was made by Amann who identified the officers as policemen and FBI agents, announced that they were there to arrest four fugitives, that everyone in the house was to come out, and if they would, the fugitives would be taken by the officers who would then leave, the agents heard the sound of running footsteps inside the house. After the 60 seconds expired, there was a lapse of several more seconds at which time the additional announcement was made that if the occupants did not come out within 15 seconds that tear gas would be fired. At the end of these 15 seconds, there was no response from the occupants, and after several more seconds had elapsed, Mr. Linberg gave orders via walkie-talkie radios to the two agents who had been assigned the tear gas guns and shells to fire gas into the rear windows of the building, which they did. Simultaneously therewith or instantaneously thereafter, a heavy barrage of automatic rifle fire came from 1148 Lewis Street, and after this burst of fire, numerous other shots were fired from inside of the house. These shots were returned by Special Agents and police officers. During the barrage of gunfire from inside the residence, Jackson Police Detective Lt. Louis Skinner was fatally wounded by a rifle bullet through his head, Officer Billy Crowell of the Jackson Police was wounded in the shoulder, and Special Agent William R. Stringer, Federal Bureau of Investigation, was seriously wounded by a rifle bullet through his thigh.

The gunfight lasted approximately 15 to 20 minutes and then subsided. Seven occupants, identified as Larry Jackson,[1]

---

1. The misdemeanor warrant for Jackson listed him as "Larry last name unknown". He was indicted with the other defendants herein but, because he was 16 years of age at the time of

the occurrence which gave rise to this indictment and who at this time is 17 years of age, and had not waived his right to be proceeded against as a juvenile in accordance with 18

and the defendants, Wayne Maurice James, Ann Lockhart, Robert Charles Allen Stalling, Toni Renee Austin, Thomas Edward Norman, and Denis Paul Shillingford, emerged from the rear of the building and were taken into custody by FBI agents and immediately placed under arrest for assaulting a federal officer. All of the individuals were immediately searched, and Special Agent Agnew of the FBI located a bullet clip containing live 7.62 millimeter rifle cartridges in the right rear pocket of Wayne James, a/k/a Offoga Quadduss.

Special Agent Amann immediately asked the seven individuals, "Who fired the automatic weapon?" and Wayne James replied, "I did." Amann asked, "Who else fired weapons?" and Norman stated, "We all did." The seven individuals were then taken to the curb on Lewis Street approximately one hundred yards from the house in question at which time they were given their "Miranda warning or advice" by Special Agent Holder, and each acknowledged his understanding thereof. Thereafter, Amann questioned each individual, and Norman stated that he had fired a "British 303" out of the front, east side and back of the residence; Shillingford advised that he fired a "M–1" rifle out of the west side of the residence; James stated that he had fired an "AR–180" automatic weapon from the front, both sides and back of the residence and had shot "at any white person I could see." Jackson stated that he fired a "30:06" rifle out of the west side of the residence; Stalling stated that he had not fired a weapon but took the two black female defendants, Toni Renee Austin, a/k/a Njeri Quadduss, and Ann Lockhart, a/k/a Tamu Sana, into a fortified bunker beneath the residence. The two female defendants denied firing any weapons.

No officer entered the house until approximately 7:45 a. m. because of the presence of a large amount of tear gas.

Their reasons for entering were to search for the felony fugitive, Steiner, and two of the alleged misdemeanants who had not been located, to determine if anyone was injured and in need of assistance within the residence in view of the amount of gunfire, as well as to determine if anyone else was present who constituted a further imminent threat to their lives and safety inasmuch as they were exposed to the further danger of being shot by anyone still within the building.

The few officers who entered made a cursory search for any of the foregoing persons, without locating any additional occupants; however, weapons, ammunition, spent casings, a live bomb, "Molotov Cocktails" and various publications were observed in plain or open view throughout the residence, as was a closet entrance to a fortified bunker under the house from which a tunnel ran. Before a further search could be made at the Lewis Street address, it was evacuated for fear of explosion of the live bomb which was later deactivated by an Army unit.

At this time, Chief Tullos ordered that all evidence be seized in view of the death of a police officer and the serious injury to Crowell and Agent Stringer.

In the meantime, as soon as it was determined that the federal fugitive, Steiner, was not among those arrested at 1148 Lewis Street, at approximately 6:56 a. m. on August 18, Agent Linberg gave a radio order for the operation to begin at 1320 Lynch Street. Occupants at that address were ordered by an FBI agent using a bullhorn or megaphone to come out and identify themselves after being given the same information and instructions which Agent Amann announced at the Lewis Street address. After approximately one minute, four individuals emerged from the residence. They were identified as the defendant, Richard Henry, a/k/a Imari Obadele, I, president

---

U.S.C. §§ 5031–5037, he was dismissed as a defendant herein on motion which was conceded by the Government which announced

that it would proceed against him in a separate action as a juvenile.

of the RNA, and three others, all of whom were searched by the agents and policemen who had heard the gunfire and knew via two-way radio of the shooting of the three officers at the Lewis Street address. A fully loaded nine-round .45 caliber automatic ammunition clip was removed from the back pocket of Henry, a/k/a Obadele, and after the officers determined that none of the four who emerged were those being sought, some of the agents went into the Lynch Street address to search for the fugitives, including Steiner. In the first room entered through the front door they discovered in plain view a .45 caliber automatic pistol, which was later determined to be stolen, a .38 caliber revolver on which the serial number had been obliterated in violation of the National Firearms Act, a .30 caliber carbine rifle, a Springfield Garrand rifle, between 1,000 and 2,000 rounds of .45, .30 and .38 caliber ammunition and shotgun shells, and two gallon jugs of gasoline, all of which were seized. The four individuals were arrested for possession of stolen property.

The weapons which were in plain view and seized in the Lewis Street house were a .38 Colt automatic pistol with a loaded clip, a 30:06 rifle and scope with a live round in the chamber, a .30 caliber M–1 rifle with a loaded clip but no live bullet in the chamber, a .30 caliber Marlin rifle, an AR–180 automatic rifle with a live round in the chamber and 29 live rounds in the magazine, four quart bottles of gasoline with wicks therein, known as "molotov cocktails", a live bomb, various live ammunition and spent ammunition casings on the floor. The first three of the above weapons were found in the bunker area and the other weapons under the house nearby.

After the arrested individuals were taken to Jackson Police Headquarters, Special Agents Samuel N. Jennings and Ronald R. Gieger interviewed them and asked them to sign a Waiver of Rights form, which all refused to sign while acknowledging that they understood their rights which were again read to them. No threats or coercion were exercised toward, nor promises made to any of the arrestees. At that time the defendants Stalling, Austin and Mathews made some alleged incriminating statements. When Stalling was taken to his cell following the interview with Jennings, he made an additional incriminating statement to Special Agent Crumley.

On August 19, 1971, the defendant, Richard Henry, a/k/a Imari Obadele asked to see a representative of the Department of Justice and was interviewed by Special Agents Jennings and Gieger, at which time he declined to sign an Advice of Rights form but stated that he knew his constitutional rights and made some alleged incriminating statements.

This Court finds that the entry into the premises at 1148 Lewis Street and 1320 Lynch Street was reasonable and lawful, and that the search of both premises was necessitated by the exigencies of the circumstances.

■ The officers had valid arrest warrants for the felony fugitive, Steiner, and for the three alleged misdemeanants. A search warrant is not necessary to execute an arrest warrant on the premises of a third party if the authorities reasonably believe that the fugitive can be found on the premises searched. *United States v. McKinney,* 379 F.2d 259, 263 (6th Cir. 1967). The law enforcement authorities reasonably believed that the fugitive, Steiner, was on the premises because information to that effect had been furnished by a confidential informant inside the RNA whose information had never proved to be unreliable which corroborated other information obtained in the middle of July that Steiner was in Jackson, Mississippi. *United States v. Robinson,* 457 F.2d 1304 (5th Cir. 1972); *United States v. Acosta,* 411 F.2d 627, 629 (5th Cir. 1969); *cf. Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed. 612 (1972). After the seven individuals surrendered at the Lewis Street address and the four other

persons emerged from the house on Lynch Street, and it was determined that the fugitive, Steiner, and two of the alleged misdemeanants were not among them, the officers were certainly justified in entering the residences in search of these individuals.

■ Furthermore, a fifteen to twenty minute gun battle had just taken place on Lewis Street in which three law officers had been shot, one fatally. The authorities had returned the fire and were justified in reasonably believing that there were individuals in the residence in need of assistance. In addition, they entered the house in search of any confederate or accomplice who had possibly fired shots resulting in the death of one policeman and the wounding of another and an FBI agent and who posed an immediate and definite threat of further fatally or seriously injuring other officers on the scene. Likewise, the officers attempting to locate the fugitive, Steiner, and the other alleged misdemeanants at the Lynch Street address, were aware of the shooting of the officers approximately 25 minutes earlier on Lewis Street and had removed a fully loaded nine-round .45 caliber automatic ammunition clip from the back pocket of Henry, a/k/a Obadele, upon his emergence from the Lynch Street premises. It was not unreasonable for the officers at both places to expect more violence to erupt at any time, and they properly, reasonably and lawfully made a cursory search of the houses for *persons* and *weapons, United States v. Barone,* 330 F.2d 543 (2d Cir. 1964), and were not required to lay seige to the houses to await search warrants. *Warden v. Hayden,* 387 U.S. 294, 298–299, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *United States v. Joe Don Looney,* 481 F.2d 31 (5th Cir. 1973); *United States v. Briddle,* 436 F.2d 4 (8th Cir. 1970), *cert. denied,* 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 824; *Wayne v. United States,* 115 U.S.App.D.C. 234, 318 F.2d 205, 212–214 (1963), *cert. denied,* 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963); see also *Adams v. Williams,* 407 U.S. 143, 146–147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *White v. Brough,* 332 F.Supp. 438, 449 (D.Md.1971).

■ The defendants' reliance on *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), which restricts a search incidental to arrest to that limited portion of the premises which is within the arrestee's immediate control and from which he might be able to reach a weapon or destructible evidence, is misplaced. *Chimel* is readily distinguishable from the case sub judice on its facts inasmuch as the law enforcement officers were not routinely searching any room other than that in which the arrest occurred. There is no indication in *Chimel* that any of the challenged items had been in the plain view of any officer who at the time he saw them was in a place where he had a right to be as a part of a proper security check of the area where the arrest occurred which is present in the instant case. *United States v. Looney, supra; United States v. Briddle, supra.*

Not only did the officers have arrest warrants when they, acting as reasonable officers under the circumstances, justifiably feared for their lives, reasonably believing that the persons whom they sought to arrest were present in the house based upon information from an informant whose information had never been unreliable, as distinguished from anonymous tipsters. They had the right to be where they were even aside from the exigencies which existed. Actually, they had not only the right, but the duty, as peace officers, to enter the premises for their own protection and the protection of others, which is the well established exception to the requirement of a search warrant. *United States v. Holiday,* 457 F.2d 912 (3d Cir. 1972); *United States v. Cecil,* 457 F.2d 1178, 1180 (8th Cir. 1972); *United States v. Miller,* 145 U.S.App.D.C. 312, 449 F.2d 974, 977 (1971); *United States v. Looney, supra.*

■ Once inside the Lewis Street premises, the agents saw in open and plain view, weapons, ammunition, spent casings, bombs, molotov cocktails, and

534

various publications, including the alias name of the felony fugitive, "Sylee", whom the defendant, Norman, testified was present in the Lewis Street house two days prior to August 18, 1971. The weapons and ammunition discovered at the Lynch Street address were also observed in open and plain view. Therefore, having had proper justification for their entry into the houses the law enforcement officers could properly seize any evidence, including the weapons in question and all other evidence in plain view which they inadvertently came across in their search for the fugitive and others who posed an immediate threat to their safety and the safety of others, particularly in view of the firing of weapons from within the house. *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *United States v. Looney, supra, United States v. Briddle, supra.*

 This Court finds no merit in the defendants' contention that the manner in which the officers sought to execute the arrest warrants did not comport with the law. In this Court's opinion, the procedure followed by the officers in attempting to locate and arrest the fugitive, Steiner, and the three alleged misdemeanants at these premises, as heretofore examined by this Court, fully complied with the requirements of 18 U.S.C. § 3109 under the exigencies of the circumstances. See *Miller v. United States*, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 332 (1958).

Furthermore, this Court finds that the statements made by the defendants to the officers while they were seated on the curb were made voluntarily and after they had been given and understood Miranda warnings by Special Agent Holder. Furthermore, the statements made at the Jackson Police Department Headquarters by the defendants Stalling, Austin, Mathews and Henry to Special Agents Jennings and Crumley were voluntarily made by those defendants after being fully advised of their rights.

Therefore, because of the foregoing reasons and based on the cited authorities, this Court finds that the evidence seized by the officers was legally seized and not in violation of any of their constitutional rights, and the aforesaid statements made by them were freely and voluntarily given and did not violate any of their constitutional rights. This Court reserves ruling at this time on that portion of the defendants' motion seeking suppression of those statements allegedly made by several defendants prior to their being given Miranda warnings by Special Agent Holder.

It is therefore the opinion of this Court that the motion of the defendants to suppress all of the evidence and to return the physical evidence produced, with the exception of the above noted matter on which this Court has reserved ruling at this time, is without merit and will be overruled.