452 A.2d 759

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Richard HENKEL.**

Superior Court of Pennsylvania.

Argued Jan. 11, 1982.

Filed Nov. 15, 1982.

348

Robert L. Eberhardt, Deputy District Attorney, Pittsburgh, for Commonwealth, appellant.

Paul R. Gettleman, Zelienople, for appellee.

Before HESTER, BECK and VAN der VOORT, JJ.

HESTER, Judge:

On May 18, 1979, the body of 26 year old Deborah Gentile was found in Room 239 of the Greater Pittsburgh International Airport Hotel in Allegheny County, Pennsylvania. She had died of multiple .22 caliber gunshot wounds to the head and stab wounds of the chest, back and neck.

A warrant for the arrest of appellee, Richard Henkel, was issued by Judge Robert E. Dauer on October 22, 1980. Probable cause for the arrest warrant was provided by the Presentment of the June, 1979 Allegheny County Investigating Grand Jury. The investigation revealed, inter alia, that the victim and appellant had known each other quite well for approximately one year prior to her death. The victim had been employed by the appellee as a barmaid in his West End bar and restaurant in Pittsburgh. She continued to work there until an altercation between them led to her dismissal in January, 1979. A reconciliation ensued and the appellee arranged for the victim to work with his partner, Jack David Siggson, in their gold jewelry enterprise in California. The victim was employed in the jewelry business from March, 1979 until May, 1979, at which time the

appellee arranged through Siggson for her return flight to Pittsburgh.

Before the victim departed California for Pittsburgh, the appellee induced her to apply for $800,000.00 of insurance coverage through the Airline Passenger's Association. The appellee's 74 year old mother, Hannah Henkel, was the designated beneficiary.

The grand jury concluded that the afore-mentioned facts discovered during the investigation provided the probable cause to believe that the appellee committed the criminal attempt of theft by deception, criminal conspiracy and criminal homicide.

The appellee was arrested on October 23, 1980 in his residence at 2305 West Hardies Road, Hampton Township, Allegheny County, Pennsylvania. For three days immediately preceding the arrest, an investigation team led by Inspector Charles Mosser, Chief of the Homicide Division of Allegheny County, placed the appellee's residence under surveillance. At approximately 7:20 a.m. on October 23, 1979, Officers Payne and Lackovic and F.B.I. Agent Petritis approached the front door of the residence; Officer Halligan and Detectives Foot and Fitzgerald positioned themselves at the rear door. Inspector Mosser vacillated between both entrances in an effort to determine whether the appellee submitted to the officers' request to gain entry. Officer Pajac remained in the vehicle parked across the street with a dog specially trained in bomb detection.

No response came from within the home; consequently, Halligan, Fitzgerald and Mosser forcibly entered through the basement door. Upon reaching the first floor hallway, they discovered the appellee with one hand on the handrail and one foot on the bottom step of the stairway leading to the second floor. The appellee was restrained by Fitzgerald's raised shotgun and Halligan's service revolver; however, the appellee would not immediately lie face down on the floor in spite of the officers' frequent commands. Instead, he pleaded to use the second floor bathroom.

Inspector Mosser promptly opened the front door and instructed Detective Payne and Agent Petritis to briefly check the second floor for other inhabitants of the house. Detective Halligan followed them to the second floor. They completed a one-minute cursory search of the second floor and recovered a .9 millimeter automatic handgun lying on the bedroom floor and partially concealed beneath the bed.

On October 23, 1980, the day of arrest, a search warrant of the appellee's residence was issued by a nearby magistrate for the purpose of locating and seizing a .25 caliber handgun, any other firearms, documents pertaining to the purchase of said handgun, and documents proving appellee's place of residence. The probable cause for the search warrant was supplied by the cursory search conducted earlier that day and by information disclosed to authorities by Jack David Siggson, appellee's business partner.

Subsequent search warrants were issued to recover, inter alia, writing tablets, telephone bills, business cards, registered mail receipts, address books, film rolls, cassette tapes, a diamond ring, Last Will and Testament of Hannah Henkel, a telephone interceptor device and safe deposit keys. Once again, the probable cause for these warrants was largely supplied by Siggson's statements and items inadvertently seen, but not seized, during the cursory search on the day of arrest.

As a result of items seized under the authority of these search warrants, the appellee was further charged on November 2, 1980 with two counts of violating the Uniform Firearms Act; the interception, disclosure or use of wire oral communications and the possession, sale, distribution, manufacture or advertisement of intercepting devices.

On January 19, 1981, as part of an omnibus pre-trial motion, the appellee filed a motion to suppress all items seized incident to the arrest and pursuant to the search warrants. After a lengthy suppression hearing, the lower court found that the seizure of the .9 millimeter pistol, without securing a search warrant beforehand, was unlawful. The court further concluded that the use of the hand-

gun for any purpose, including evidence of guilt and probable cause for the subsequently issued search warrants was unlawful; consequently, the evidence seized under the aegis of the search warrants was likewise inadmissible. The affidavits for probable cause for the search warrants themselves; however, were deemed valid and lawful by the lower court.

The Commonwealth appeals from that portion of the Order suppressing the use of the .9 millimeter handgun as evidence; the appellee-defendant, Richard Henkel, appeals from that portion upholding the affidavits for probable cause. For purposes of clarification, the Commonwealth will hereafter be referred to as the appellant and Richard Henkel as the appellee.

The appellant's argument can be neatly capsulized as follows: the brief visual inspection of the appellee's second floor quarters was conducted solely for the purpose of protecting the officers from injury inflicted by the appellee's recondite confederates. The presence of the appellee's confederates was suspected and feared. Once it was determined that the officers were lawfully on the second floor, the appellant reasons, any items in plain view, such as the .9 millimeter handgun, could be seized. The appellee, in turn, argues that the "protective sweep" doctrine has not yet been recognized by the Pennsylvania courts. Furthermore, he maintains that the arresting officers did not know for certain whether anyone other than the appellee was present in the residence at the time of arrest; that no one, other than appellee, was seen leaving or entering the house during the three-day surveillance; that no noises came from upstairs during the arrest assault; and, the officers could have minimized any danger of physical harm by immediately removing the appellee to the premises outside the house instead of remaining inside to complete the arrest and search the second floor. The appellee's general position is that no exigent circumstances occurred after the officers' entry into his home to justify a cursory search; their fears were generated by facts known to them for weeks before

the arrest. As a result, the appellee maintains that a search warrant should have been secured prior to arrest.

■ The Fourth Amendment safeguard against unreasonable searches and seizures is aimed at deterring, inter alia, physical entry into the home. *U.S. v. U.S. District Court,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). Securing a warrant under the discernment of a detached and impartial issuing authority prevents the dangers of unfettered intrusions into such sacrosanct environments. *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). As a result, warrantless searches and seizures inside a home are presumptively unreasonable. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). This presumption can be overcome where a lawful arrest necessitates the search and seizure of dangerous weapons within reach of the accused in the interest of insuring the safety of the arresting officers. *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Commonwealth v. Bess,* 476 Pa. 364, 382 A.2d 1212 (1978). Neither *Chimel,* supra, nor *Bess,* supra, permit searches of that portion of the premises beyond the accused's immediate control.

■ The aforementioned principles of law have recently been expanded; therefore, we hold that arresting officers are permitted to conduct a brief search of the entire building, within which the accused is arrested, for the limited purpose of seeking other people who may threaten the officers' well being, provided, of course, that such officers have reason to believe that other people are present.

In *Commonwealth v. Norris,* 498 Pa. 308, 446 A.2d 246 (1982), the arresting officers broke into the defendant's apartment with neither an arrest nor search warrant, detained and arrested the defendant in the living room and then seized a knife in plain view on a bedroom nightstand. The arresting officers were apprised by the victim, after she identified the defendant as her assailant, that she had been forcibly raped at knifepoint. Furthermore, reliable sources

raised suspicion that the defendant's brother inhabited the apartment too.

The *Norris* court concluded that the officers were permitted a cursory search of the other rooms, even after the defendant was detained, in order to insure their safety from the brother or another person whose presence was reasonably suspected, but not unequivocally known. Having lawfully entered the bedroom, the officers were in a position to rightfully seize whatever instruments of crime that were in plain view. *Coolidge v. New Hampshire*, supra; *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

■ The officers in the case before us entered the appellee's house with reservations similar to those held by the officers in *Norris,* supra. In both situations, the defendants were first immobilized as part of a lawful arrest and then certain officers were instructed to search through the house for *persons* who might be hiding and posing a threat to the safety of the arresting team. Likewise, both sets of officers were cognizant of reliable information prior to arriving at the scene of the arrest. For example, the officers and agents here had sufficient cause to believe that the appellee was a dangerous man who may have been living with accomplices. There was evidence that the appellee resided with several men and women at previous addresses and that they may have worked with him on possible extortion plots and the construction and detonation of high explosives. The appellee was, at the time of his arrest, reasonably suspected in the brutal deaths of several of his accomplices. Moreover, Jack David Siggson had disclosed to officials, prior to the arrest, that the appellee kept weapons in his house; that he constructed bombs and tested them in the Summer of 1977; that Sasha Scott, one of the appellee's roommates, was killed by a bomb explosion on December 23, 1977; and, that the appellee swore not to return to jail.

The aforementioned information accumulated prior to arrest becomes more substantial when coupled with events at the time of arrest. For example, the appellee pleaded with

the officers to use the second floor bathroom for the ostensible purpose of defecation. Also, the appellee was reluctant to lie face-down on the living room floor, thereby precluding the officers from bringing him under immediate and complete detention. Inspector Mosser testified that the appellee's preoccupation with the second floor enhanced his anxiety; therefore, he commanded Detective Payne to inspect the second floor for other inhabitants, an escape route or explosives. In light of the extremely short amount of time (not in excess of one minute) taken for the search of the second floor, we cannot perceive the scope to have encompassed anything more than a search for obvious escape routes and dangerous persons in control of explosives.

Additional evidence solidifies the reasonableness of suspecting the presence of other persons in the house. The officers knew that the real estate was recorded in the name of the appellee's brother; that the handguns, said to be present by Siggson, were registered in Gary Small's name [1]; and, that the appellee's practice of living with former suspected accomplices may have been continuing with new, unknown accomplices. We are not persuaded by appellee's argument that the fear of hidden dangerous persons with possible explosives at their control could have been averted by simply moving the appellee outside. The risk of danger was just as severe as the officers moved away from the house; certainly, hidden confederates would be aware of the departure of several people.

The Third Circuit Court of Appeals, in *U.S. v. Looney*, 481 F.2d 31 (5th Cir., 1973), was confronted with the issue of whether a weapon seized pursuant to a cursory search of an area far removed from that space immediately surrounding the defendant at the time of arrest, is admissible evidence not violative of the Fourth Amendment safeguards. The *Looney* court was not impressed with the fact that the area subject to the co-defendants' immediate control was rid of harmful objects or weapons. It was far more significant that after the co-defendants were rendered immobile, the

---

1. Gary Small was the appellee's friend, former live-in mate and possible accomplice.

officers wandered throughout the house in search of *people,* not *objects.* In fact, the *Looney* court concluded that there was no Fourth Amendment search at all; the officers were merely attempting to complete the arrests without risk of harm from concealed inhabitants. As a consequence of the protective search, a machine gun was located in plain view on the floor of the second floor bedroom. The machine gun was properly seized and admissible as evidence. *Coolidge v. New Hampshire,* supra; *Harris v. U.S.,* supra. The Eight Circuit reached the same conclusion concerning the seizure of the shotgun in a similar factual background. *U.S. v. Briddle,* 436 F.2d 4 (8th Cir., 1970).

Both *Looney,* supra, and *Briddle,* supra, are easily distinguishable from *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). In *Chimel,* supra, a warrantless search was conducted of concealed spaces in rooms removed from the presence of the detained defendant; the search was conducted solely for incriminating objects. As in *Looney,* supra, and *Briddle,* supra, the case before us involved searches for people in the interest of safety and unobstructed arrest procedures. *Chimel,* supra, on the other hand, involved a warrantless search of objects; therefore, the appellee's reliance on *Chimel,* supra, is misplaced.[2]

The appellee's reference to *U.S. v. Gamble,* 473 F.2d 1274 (7th Cir., 1973); *U.S. v. Carter,* 522 F.2d 666 (D.C.Cir., 1975) and *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) is misconstrued as well. In none of these cases did the arresting officers demonstrate exigent circumstances suggesting the defendant's possible co-habitation with other persons. Also, the appellee's argument that the officers, equipped with this prior knowledge, had ample time to secure a search warrant before the arrest misses the point. Suppression hearing testimony revealed that the officers doubted having probable cause for the basis of

**2.** See *U.S. v. Bowdach,* 561 F.2d 1160 (5th Cir., 1977); *McGeehan v. Wainwright,* 526 F.2d 397 (5th Cir., 1976); *U.S. v. Smith,* 515 F.2d 1028 (5th Cir., 1975) for an approval of the protective search for persons inside a residence even where the arrest is made outside the residence.

securing a search warrant; furthermore, in reiteration, the object of the cursory search was the discovery of dangerous persons, not objects.

■ The second issue to be decided here on review is whether the search warrants executed on October 23, 1980 and October 24, 1980 were invalid as a matter of law. The appellee argues that the search warrant was defective for the following reasons: that the affidavit of probable cause for the search warrants contained misrepresentations and omissions of fact that deceived the issuing authority into believing that probable cause existed for the issuance of the warrants; that the issuing authority for one search warrant was not a detached and neutral magistrate; that the affidavit of probable cause for the search warrants was based upon stale information; and that there was no probable cause to listen to a cassette tape.

After a review of the arguments, issues and applicable law, we find the lower court opinion to be a thorough and correct response to this second view; consequently, we defer to it to that extent.

The motion to quash Commonwealth's appeal is denied. The Order of the court below suppressing the use of the .9 millimeter handgun as evidence is reversed. The Order of the court below upholding the affidavits for probable cause is affirmed.

Order reversed in part and affirmed in part.

BECK, J., files a concurring opinion.

BECK, Judge, concurring:

We agree with the majority that the police officers' search was valid but base that conclusion, under the facts of this case, on the doctrine of the moveable area of control and not, as the majority has done, on the protective sweep doctrine.

We concur with the majority's opinion that when police officers are executing an arrest they are permitted to conduct a brief search of the premises in which the arrest takes place for the limited purpose of apprehending others who

may threaten the officers' safety, provided that the officers have reason to believe that other dangerous persons are present. We disagree, however, that the facts in this case justify a "protective sweep" of the premises based on reasonable suspicion of other dangerous persons.

Since all warrantless searches are presumptively unreasonable violations of the Fourth Amendment, only where the government has obtained a valid consent, or has sustained the heavy burden of demonstrating exigent circumstances, may a warrantless search stand. *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). Among the recognized exceptions to the warrant requirement are searches growing out of the hot pursuit of fleeing felons, *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Another delineated exception is the search incident to arrest, at which time arresting officers may search the person and area within reach of the suspect, in the interest of preserving the safety of those making the arrest. *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Commonwealth v. Bess,* 476 Pa. 364, 382 A.2d 1212 (1978). When police officers have a lawful right to be on a scene, they may lawfully seize objects of an incriminating character, which are in plain view. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Commonwealth v. Seip,* 285 Pa.Super. 551, 428 A.2d 183 (1981).

The doctrine of "protective sweep" (also known as the protective walk-through, or fan-out), essentially a search of a private residence for people, not evidence, expands the well-established limits of *Chimel* for two basic purposes: one is to ascertain whether other persons are present who might endanger the safety of arresting officers; the other is the "evidentiary sweep" to determine whether other persons are present who might remove or destroy evidence believed to be located in the residence. In the instant case we are concerned only with the former.

Our analysis begins with an inquiry into whether the search of Henkel's house was conducted because police offi-

cers could reasonably justify the intrusion into the residential privacy that the Fourth Amendment protects. In this approach we follow the majority of state and federal courts which had identified a standard of justification in passing on the validity of a protective sweep.[1] The usual standard is the one defined by the Supreme Court in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) for "stop and frisk," i.e. a "reasonable suspicion" based on "specific and articulable facts." We are also guided by the test set out in *Bess, supra;* i.e. does the arresting officer reasonably believe that the arrestee might still obtain weapons from another area and attempt to use them.

The Commonwealth here maintains that the protective sweep was justified by the heinous nature of the crime and the dangerous propensities of the suspect; by a reasonable belief that confederates of the arrestee were present; by a fear (based on the accused's past record) that bombs or explosives were in the house; and also on the basis of Henkel's own actions and words at the time of the arrest. We examine each of these contentions.

The Supreme Court has recently addressed the question of whether the search of a homicide scene should be recognized as an exception to the warrant requirement. The Arizona Supreme Court had ruled that the warrantless search of an apartment where a police officer was murdered was constitutionally permissible:

"We hold a reasonable, warrantless search of the scene of a homicide—or of a serious personal injury with likelihood of death where there is reason to suspect foul play—does not violate the Fourth Amendment to the United States Constitution where the law enforcement officers were legally on the premises in the first instance.... For the search to be reasonable, the purpose must be limited to determining the circumstances of death and the scope

1. Standards, and other aspects of the protective sweep doctrine, are discussed in Kelder and Statman, The Protective Sweep Doctrine; Recurrent questions regarding the propriety of searches conducted contemporaneously with an arrest on or near private premises, 30 *Syracuse Law Rev.* 973 (1979).

must not exceed that purpose. The search must also begin within a reasonable period following the time when the officials first learn of the murder (or potential murder)." *State v. Mincey,* 115 Ariz. 472 at 482, 566 P.2d 273 at 283.

The Supreme Court reversed, in an opinion joined by eight justices, holding that even the exigency of a murder committed *on premises* did not justify a warrantless search.

[T]he State points to the vital public interest in the prompt investigation of the extremely serious crime of murder. No one can doubt the importance of this goal. But the public interest in the investigation of other serious crimes is comparable. If the warrantless search of a homicide scene is reasonable, why not the warrantless search of the scene of a rape, robbery, or a burglary? "No consideration relevant to the Fourth Amendment suggests any point of rational limitation" of such a doctrine. *Chimel v. California, supra,* 395 U.S. at 766, 89 S.Ct. 2034, 2041, 23 L.Ed.2d 685.

Moreover, the mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment. Cf. *Coolidge v. New Hampshire, supra,* [403 U.S.] at 481, 91 S.Ct. 2022 [2045], 29 L.Ed.2d 564. The investigation of crime would always be simplified if warrants were unnecessary. But the Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law.

*Mincey v. Arizona,* 437 U.S. 385, 393, 98 S.Ct. 2408, 2414, 57 L.Ed.2d 290 (1978). In light of *Mincey,* the heinousness of a crime committed elsewhere cannot be used to justify the search of a suspected murderer's residence.

The Commonwealth argues that Henkel's tendency to use confederates justified the sweep. Since the search for other dangerous persons reasonably believed to be on premises is the essential purpose of the protective sweep, this element of the case requires careful scrutiny. Police surveillance of Henkel's residence for about three days prior to the arrest

failed to note anyone but Henkel entering or leaving the house. (R.136–9, 248, 379–83, 413–21). No one but Henkel was sighted through the windows, and no noises were heard from other rooms (R.151–2). The arresting police officers, when questioned during the trial, admitted that they did *not* believe there were other persons in the house at the time that they entered. (R.239, 344–5, 375). Appellee had, in the past, lived at another address with accomplices, but the record shows that at the time in question Henkel's principal co-conspirator lived in California (R.11–12, 28, 121, 271–2). Henkel had been seen with another individual who had a criminal record shortly before the arrest, but that person was known to live elsewhere in Pittsburgh (R.74). Showing that an arrestee has lived with confederates in the past (at other residences), or that some confederates in the crime have not yet been apprehended, does not lead to the reasonable conclusion that dangerous accomplices are expected to be found in the home, when direct observation and reliable information leads to the opposite conclusion.

The Commonwealth argues also that appellee's past record of criminal use of bombs and explosives justified the sweep. A bomb dog accompanied the arresting team of eight or nine men, but was not used in the cursory sweep of the second floor, nor in the subsequent search conducted under the auspices of a warrant. It appears, therefore, that the fear of bombs was not, in fact, the underlying rationale of the residential sweep.

We turn now to the particular behavior of arrestee Henkel when he was being taken into custody. At the time the police were executing the arrest, Henkel resisted their orders to lie on the floor and attempted to use the stairs to the second floor, purportedly for the purpose of using the bathroom. This behavior led the officers to suspect that he was trying to lay hands on a weapon, or to effect an escape by means of an exit to an adjoining second floor residence. In this connection we note that courts have conceived of a "moveable area of control", extending the search incident to arrest in those instances in which the arrestee is moving to other parts of the premises, usually to the bedroom in order

to dress. When movement is necessary, or made at the behest of the arrestee, courts have unanimously upheld the search of those areas into which the arrestee is to move, including closets in the rooms that are entered.[2] *United States v. Smith*, 565 F.2d 292 (4th Cir.1977); *United States v. Manarite*, 314 F.Supp. 607 (S.D.N.Y.1970), aff'd 448 F.2d 583 (2d Cir.1971), cert. den. 404 U.S. 947, 92 S.Ct. 298, 30 L.Ed.2d 264 (1971).

Under those circumstances where police executing an arrest reasonably believe there are other persons on premises who might endanger their safety, we agree that Pennsylvania law should permit a cursory sweep in the interest of protecting officers engaged in the hazardous work of law enforcement. On the facts of this case, however, we reject the use of the protective sweep doctrine to justify the search, since there was no reason to believe that there were persons on the second floor of the house. However, since Henkel himself was attempting to reach the second floor, we uphold the sweep on the basis of the "moveable area of control." Accordingly, we find that the police lawfully and constitutionally retrieved the .9 mm. weapon that was partially exposed under a second floor bed, and we reverse the lower court.

**2.** Ringel, *Searches and Seizures, Arrests and Confessions* (2d ed. 1981), 12.5(c).