**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Wayne Maurice JAMES, a/k/a Offaga Quaddus, Ann Lockhart, a/k/a Tomu Sanna, Robert Charles Allen Stalling, a/k/a Brother Black, Toni Rene Austin, a/k/a Njeri Quaddus, Thomas Edward Norman, a/k/a Hekima Ana, Denis Paul Shillingford, Richard Bullock Henry, a/k/a Imari Abubakari Obedele, Defendants-Appellants.**

No. 73–3383.

United States Court of Appeals,
Fifth Circuit.

March 19, 1976.
Rehearing and Rehearing En Banc
Denied June 7, 1976.
See 532 F.2d 1054.

Robert Hauberg, U. S. Atty., James B. Tucker, Daniel E. Lynn, Asst. U. S. Attys., Jackson, Miss., Timothy J. Wilson, Atty. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Jack H. Young, Jr., Jackson, Miss. (court-appointed), for Austin.

Fred L. Banks, Jr., Jackson, Miss. (court-appointed), for Stalling.

Hermel Johnson, Jackson, Miss. (court-appointed), for James.

Raymond E. Willis, Detroit, Mich. (court-appointed), for Henry.

George M. Strickler, Jr., New Orleans, La. (court-appointed), for Shillingford.

Firnist J. Alexander, Jr., Jackson, Miss. (court-appointed), for Norman.

Constance Iona Slaughter, Forest, Miss. (court-appointed), for Lockhart.

William H. Allison, Jr., Louisville, Ky., for defendants-appellants.

Before WISDOM and BELL,* Circuit Judges, and BREWSTER, District Judge.

BREWSTER, District Judge:

This appeal involves seven appellants, each of whom was convicted for one or more of the offenses charged in a four court indictment.[1]

Each of the seven appellants was convicted under Count I alleging a conspiracy in violation of 18 U.S.C. § 371,[2] to commit the offenses of (1) assault on federal officers engaged in the performance of their duties, in violation of 18 U.S.C. § 111,[3] (2) of using firearms to commit the assault in violation of 18 U.S.C. § 924(c), and (3) of unlawfully possessing unregistered firearms required by law to be registered, in violation of 26 U.S.C. § 5861(d).[4] The firearms were described as an automatic rifle, a fragmentation bomb and incendiary devices. Three overt acts hereinafter discussed were alleged.

Henry, Shillingford, Norman and James[5] were the only appellants named in Counts II and III charging respectively the substantive offenses above described as the first and second objects of the conspiracy.[6]

---

* This opinion was concurred in by Judge Bell prior to his resignation from the Court on March 1, 1976.

1. Nine defendants were named in the indictment, but two of them did not go to trial with the seven who are prosecuting this appeal. One of the two was a fugitive, and the government decided not to proceed against the other one under this indictment when it was discovered after the return thereof that he was a juvenile.

2. 18 U.S.C. § 371—

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

3. 18 U.S.C. § 111—

"Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years, or both.

"Whoever, in the commission of any such acts uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

The persons designated in 18 U.S.C. § 1114 included "any officer or employee of the Federal Bureau of Investigation of the Department of Justice."

4. 26 U.S.C. § 5861(d)—

"It shall be unlawful for any person—

\* \* \* \* \* \*

"(d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record;"

5. Each defendant was indicted under his Christian name and the name he had assumed as a "citizen" of the Republic of New Africa. Some of them identify themselves by their latter names in their briefs. They will be referred to by their Christian names in this opinion.

6. Count II is predicated on both 18 U.S.C. § 924(c), and 18 U.S.C. § 2, the aiding and abetting statute.

James was the only defendant named in Count IV, which charged him with the substantive offense above described as the third object of the conspiracy.

Each defendant was found guilty by a jury of all of the charges against him. Toni Austin and Ann Lockhart, the two female defendants, were each sentenced to three years on her Count I conviction. Henry, Shillingford, Norman and James each received a seven year sentence on his Count II conviction. The sentence on each of the other convictions was five years. By provision for concurrent and consecutive sentences on their convictions, Henry, Shillingford, Norman and James each had twelve years to serve.

The date of the commission of each of the substantive offenses was August 18, 1971.[7]. The conspiracy charged in Count I was claimed to have begun on or about July 15 and to have continued to and including August 18, when it culminated in a shoot-out at about 6:30 A.M. between FBI Agents and members of the police force of Jackson, Mississippi, on the one hand, and the appellants on the other, at the "capitol" of the Republic of New Africa (RNA) in Jackson, resulting in the death of a Jackson policeman, the wounding of another and of an FBI Agent. The FBI was there to execute an arrest warrant on Jerry R. Steiner in pursuance of a complaint charging him with unlawful interstate flight to avoid prosecution on a first degree murder charge in Michigan. The Jackson police were participating to execute warrants on misdemeanor charges on three persons they had good reason to believe were in the house with Steiner and others. The warrant was not served on Steiner because, for some reason that was never satisfactorily explained, he left the house at 11:00 p. m. on the night before the visit by the FBI to serve the warrant on him. The FBI had no knowledge of his departure until after the shoot-out.

The actual trial of this case lasted twenty-two days. Several additional days were devoted to hearings on more than thirty-five pre-trial motions.[8] The transcript of the proceedings on the motions contains almost 1800 pages, and of the proceedings on the trial, over 4900 pages. In addition, there are voluminous exhibits. The case was bitterly contested from the time of the return of the indictment. Almost twenty points are urged as a basis for reversal. Some of them are fragmented[9] with the result that there are actually many more legal questions than points of error. It is obviously impractical to indulge in an extended discussion of each claim of error; but the transcripts of all the proceedings have been read, and each claim of the appellants has been thoroughly considered.

█ The factual summary is detailed and complete to save repetition in the discussion of the grounds urged for reversal. The evidence will necessarily be viewed from the standpoint most favorable to the government. *Glasser v.*

---

7. With this exception, "1971" will not appear with the month and the day thereof, as all actions relating to the offenses occurred in 1971. Unless otherwise indicated, the year was 1971.

8. Some of the hearings on the motions were evidentiary. One of them lasted two full days.

9. For instance, one of the points is based on claimed misconduct of the judge. Thirty-seven acts of the trial judge are complained of. The point of prosecutorial misconduct is based on seven separate acts of the prosecutors. The point that there was reversible error in the court's jury instructions is based upon the refusal to give some requested instructions and upon a number of objections to the instruc-

tions given. The challenge of the entry into and the search of the RNA "capitol" is atomized into a number of grounds. This description could go on and on, but it will close with the statement that the study of the 4900 plus page transcript and the pertinent original exhibits to determine the sufficiency of the evidence to support the sixteen convictions, in itself, has been a time consuming, arduous job. This statement is not made by way of complaint about the work or of the fact that counsel for the appellants have represented their clients vigorously in the trial and on appeal. The purpose of the statement is to account for the length of this opinion and of the nature of the Court's discussion of some of the points.

*United States,* 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680.

A general knowledge of the RNA is necessary to an understanding of this case. The appellants claim that hostility of the FBI and the Jackson law enforcement officers toward the RNA caused such officers to use the arrest warrants as a pretext to intrude and search RNA properties on August 18th. The government contends that the purposes and set-up of the RNA furnished both the motive and the framework for the actions of the appellants that constituted the offenses here involved. The fugitive Steiner and all of the appellants, except Ann Lockhart, were "citizens" of the RNA; and some of the appellants were high officials of it.

The RNA claims that it is an independent foreign nation composed of "citizens" descended from Africans who were at one time slaves in this country. It contends that the African slaves in America were converted into a free community by, successively, the Confiscation Acts of 1861 and 1862, the Emancipation Proclamation of January, 1863, and the Thirteenth Amendment to the Constitution of the United States. It further insists that the citizenship of the slaves, upon being freed, reverted to that of their ancestors at the time they were taken in Africa to be brought to America.[10] That means to the RNA that they resumed African citizenship and owed no allegiance to this country.[11]. The RNA claims that it, and not the United States, is sovereign over Mississippi, Louisiana, Alabama, Georgia and South Carolina, because those are lands "upon which the Africans had lived in the majority traditionally and which they had worked and developed." It says that it has asserted

sovereignty over those lands ever since "the blacks occupying it took up arms against the authority of the United States and thus asserted their New African nation's claim to the land, and, briefly, to independence" when President Andrew Johnson issued proclamations in 1865–1866 giving that land back to its former owners. The RNA says that its sovereignty over the lands in the five named states has never ceased, and that the United States has merely operated there without right or authority. It claims that its efforts to regain that land have intensified since the "formal revival and organization" of the New African Government by proclamation on March 31, 1968.[12]

The provisional "capitol" of the RNA on August 18 was a residential building at 1148 Lewis Street in Jackson, but the RNA was in the process of moving it to another residential building in Jackson at 1320 Lynch Street. The officers of the RNA worked and lived in the "capitol". Some "citizens" and a few potential "citizens" also stayed in the "capitol" for periods of time. An armed guard was usually stationed at or near the entrance of the "capitol", and persons not well known to them were searched before being allowed to enter. "Citizens" in the "capitol" had been seen to point weapons at police cars as they drove by.

"Security" was an uppermost concern of those who worked in the "capitol". A substantial part of the time of a three day RNA meeting known as "The People's Center Conference" (PCC), held in Jackson in mid-July, attended by "citizens" of RNA from Africa and throughout the United States, was devoted to discussion of security measures for its

---

10. "If Africans were Africans before they were enslaved by American Municipal Law, they remained Africans after the Amendment of the Municipal Law by any means." Henry's Brief, p. 65.

11. "The descendants of the free community of former slaves represented by the present Government of the Republic of New Africa have made clear through the posture of their Government and its citizens that the citizens

of their country hold no allegiance to the United States." Henry's Reply Brief, p. 17.

"Once freed from slavery by law, the slave reverted to his former nationality and could not then be dictated to by the former slave holder." Henry's Reply Brief, p. 18.

12. The quotations in the body of the paragraph are from pages 15 and 16 of Henry's Reply Brief.

officials and "capitol". RNA "citizens" were "cautioned to be wary of bad faith arrest tactics which might come from local police".[13] Military-type drills with weapons were held periodically from the time of such meeting until August 18. The "citizens" participating in those drills were taught that, upon the command, "jump", they should get their weapons and go to certain vantage points where they could fire at persons trying to "intrude" the "capitol". They kept their long guns stacked, military-style, in one of the rooms of the "capitol" where they would be readily accessible if a "jump" order were given.

Appellant Henry was President of the RNA during all of the period pertinent to this case.

The FBI kept advised of the developments of the RNA through a paid black informer who posed as a "citizen" of RNA and was on the "inside".

On the late evening of August 13, after regular business hours, a teletype message was received by the FBI office in Jackson, from the Detroit, Michigan FBI office on the exclusive wire for FBI communications that on that date a complaint had been filed in Grand Rapids, Michigan charging one Jerry R. Steiner, also known as Sylee Lagondele Omos, I., with violation of 18 U.S.C. § 1073, by unlawful flight to avoid prosecution on a first degree murder charge, and that an arrest warrant, a copy of which was enclosed, had been issued by United States District Judge Engel of Grand Rapids. Steiner was charged by the State of Michigan with the first degree murder of a 17 year old service station attendant, who was shot in the back of the head during a robbery of the station at which he was employed. A state warrant was outstanding against him on the murder charge. The teletype also advised the FBI that Steiner had in the past resisted arrest and should be considered extremely dangerous in view of that resistance and of the first degree murder charge.

In mid-July, Agent Holder of the Jackson office of the FBI received information from an unrecalled source that Steiner was in Jackson, and was later advised by a confidential informant "who had never been found to be unreliable" that on August 17 Steiner was present at the Lewis Street provisional "capitol" of the RNA and there was no reason to believe that he would soon be leaving that address. Agent Holder first knew that Steiner was a fugitive wanted for murder when he saw the teletype in FBI headquarters on Monday morning, August 16, at the time that matter was assigned to him. The teletype also gave a detailed description of Steiner.

The teletype was received and acted upon during the time the RNA was in the process of moving its "capitol" from 1148 Lewis Street to 1320 Lynch Street in Jackson.

On the morning of August 16, Agent Linberg, who was in charge of the Jackson FBI office, read the teletype and asked Jackson Police Chief Tullos for assistance from the Jackson police in attempting to arrest Steiner, in view of the fact that Linberg knew that the Jackson police had outstanding misdemeanor warrants for the arrest of three subjects reportedly staying at 1148 Lewis Street. The FBI and Jackson police considered the RNA to be an extremist organization inasmuch as they knew that it had proclaimed itself to be an independent nation, had openly professed its intention to acquire all of the property which comprised five southern states, had publicly held military-type drills with weapons, and had pointed weapons at police officers patrolling past 1148 Lewis Street. Furthermore, the appellant Henry, the President of the RNA, was reported by the press in Jackson to have threatened to "wipe out the National Guard of Mississippi" and to set up a separate nation in the United States through the acquisition of the five southern states.

---

**13.** Quotation is from p. 7 of Norman brief.

On the afternoon of August 17, Agent Linberg met with Chief Tullos at approximately 4:30 p. m. at the latter's office in Jackson Police Headquarters and informed him of the unlawful flight warrant for Steiner and of his reported whereabouts. At that time, the Chief informed Linberg that the Jackson police had misdemeanor arrest warrants for Jesse Hicholson, Henry Hatcher and one of the original defendants herein, Larry Jackson, one of them having been charged with assault on a newspaper reporter at RNA headquarters. The Jackson police would not have tried to serve those warrants because of the danger that service entailed if the FBI had not had the felony fugitive warrant and asked for their cooperation. Later in the evening of August 17, there was another meeting between Chief Tullos, Agent Linberg and approximately 15 FBI agents and 12 Jackson policemen. At that meeting, strategy was mapped for attempting to execute the one felony and the three misdemeanor arrest warrants at the Lewis and Lynch Street addresses of the RNA. Approximately 12 policemen and 15 FBI agents were to participate in the attempted arrests at approximately 6:30 a. m. on August 18, some to be stationed outside the Lewis Street "capitol" and some outside the Lynch Street provisional "capitol". At that meeting, it was decided that the officers would be equipped with gas masks, that two or three would have tear gas guns and shells, flak vests, sidearms, shotguns and helmets. None carried rifles or any automatic weapons. The 6:30 a. m. time, which was well after daylight, was decided upon because there was less possibility that people would be on the sidewalk and streets at that time of day where they would be exposed to serious injury if the RNA re-acted in the violent manner considered highly probable.

In view of the foregoing facts and reliable information that armed guards were on duty at the Lewis and Lynch Street addresses 24 hours a day, the following plan of action was agreed upon to effect the desired arrests.

Each agent and police officer was given a specific assignment and furnished a description of the four subjects. The plan for the apprehension was to place a police car with a flashing blue light in front of 1148 Lewis Street and to then advise the occupants by way of a bullhorn of the purpose of the officers' presence and request all occupants to emerge from the building and identify themselves. If they did not come out within one minute, they were to be given an additional 15 seconds and told that if they were not out within that time tear gas would be fired into the rear part of the residence. If the fugitives were not located at 1148 Lewis Street, Agent Linberg would give an order for agents and police at Lynch Street to commence a similar operation immediately.

In accordance with such prearranged plan, agents and officers took positions around the two buildings. At 6:30 a. m. the occupants of 1148 Lewis Street were advised over a bullhorn or megaphone by Special Agent Amann that FBI agents and officers of the Jackson Police Department had the residence completely surrounded; that the officers had warrants for the arrest of four occupants at that address; and that within 60 seconds all residents were to surrender immediately through the front door with their arms extended over their heads. After the first 60 second announcement was made by Amann that they were there to arrest four fugitives, that everyone in the house was to come out; and that if they would, the officers would take the fugitives in custody and leave, the agents heard the sound of running footsteps inside the house. After the expiration of 60 seconds, there was a lapse of several more seconds at which time an announcement was made that if the occupants did not come out within 15 seconds, tear gas would be fired. At the end of those 15 seconds, there was no response from the occupants; and after several more seconds had elapsed, Linberg gave orders via walkie-talkie radios to fire tear gas cannisters into the rear windows of the building, which was done.

Simultaneously with the firing of the tear gas, or instantaneously thereafter, a heavy barrage of automatic and other rifle fire came from inside the "capitol"; and shooting from there continued for about twenty minutes. Special Agents and police officers returned the fire. During the barrage, Jackson Police Detective Lt. Louis Skinner was killed by a rifle bullet through his head, Jackson Police Officer Billy Crowell was shot in the shoulder, and Special Agent Stringer of the FBI was seriously wounded by a rifle bullet through his thigh.

After about 20 minutes, seven occupants identified as Larry Jackson,[14] and the appellants, James, Lockhart, Stalling, Toni Rene Austin, Norman, and Shillingford, emerged from the rear of the building and were taken into custody by FBI agents and placed under arrest for assaulting a federal officer. All of the individuals were immediately searched, and FBI Agent Agnew located a bullet clip containing live 7.62 millimeter rifle cartridges in the pistol pocket of appellant James.

Agent Amann immediately asked the seven individuals, "who fired the automatic weapon?", and James replied, "I did." Amann inquired, "who else fired weapons?" and Norman stated, "We all did." The seven individuals were then taken to the curb on Lewis Street approximately one hundred yards from the "capitol", where they were given their Miranda warning by Agent Holder, and each acknowledged his understanding thereof. None requested a lawyer or had any objection to answering the few questions which followed. Norman told Agent Amann that he had fired a British 303 out of the front, east side and back of the "capitol". Shillingford advised that he fired an M–1 rifle out of the west side of the "capitol". James stated that he fired an AR–180 automatic weapon from the front, both sides and back of the building, and that he shot at any white person he could see. Jackson

stated that he fired a 30:06 rifle out of the west side of the building. Stalling stated that he did not fire a weapon because he was engaged in getting the two female defendants, Toni Rene Austin and Ann Lockhart, into a fortified bunker beneath the house. The two female defendants denied firing any weapons. All of the statements were made to Agent Amann in answer to questions.

No officer entered the building until approximately 7:45 a. m. because of the presence of a large amount of tear gas. Their reasons for entering were to search for the felony fugitive, Steiner, and two of the alleged misdemeanants who had not been located, to determine if anyone in the house was injured and in need of assistance, as well as to see if anyone was present in the house who constituted a further imminent threat to their lives and safety, inasmuch as they were exposed to the further danger of being shot by anyone still within the building.

The few officers who entered made a cursory search for any of the foregoing persons, without locating anyone; however, weapons, ammunition, spent casings, a live bomb, "Molotov Cocktails", and various publications were observed in plain view throughout the residence, as was a closet entrance to a fortified bunker under the house from which a tunnel ran. Before a further search could be made at the Lewis Street address, it was evacuated for fear of explosion of the live bomb which was later deactivated by an Army unit.

At that time, Chief Tullos ordered that all evidence be seized in view of the death of a police officer and the serious injury to Crowell and Agent Stringer.

In the meantime, as soon as it was determined that the federal fugitive, Steiner, was not among those arrested at 1148 Lewis Street, at approximately 6:56 a. m. on August 18, Agent Linberg gave a radio order for the operation to begin at 1320 Lynch Street. Occupants at that

---

14. Jackson was the defendant who was not tried under the indictment because he was a juvenile.

address were ordered by an FBI agent using a bullhorn or megaphone to come out and identify themselves after being given the same information and instructions which Agent Amann had announced at the Lewis Street address. After approximately one minute, four individuals emerged from the residence. They were identified as the appellant Henry and three others, all of whom were searched by the agents and policemen who had heard the gunfire and knew via two-way radio of the shooting of the three officers at the Lewis Street address. A fully loaded nine-round .45 caliber automatic ammunition clip was removed from the pistol pocket of Henry; and after the officers determined that none of the four who emerged were those being sought, some of the agents went into the Lynch Street address to search for the fugitives, including Steiner. In the first room entered through the front door, they discovered in plain view a .45 caliber automatic pistol, which was later determined to be stolen, a .38 caliber revolver on which the serial number had been obliterated in violation of the National Firearms Act, and .30 caliber carbine rifle, a Springfield Garrand rifle, between 1,000 and 2,000 rounds of .45, .30 and .38 caliber ammunition and shotgun shells, and two gallon jugs of gasoline, all of which were seized. The four individuals were arrested for possession of stolen property.

The weapons which were in plain view and seized in the Lewis Street house were a .38 Colt automatic pistol with a loaded clip, a 30:06 rifle and scope with a live round in the chamber, a .30 caliber M–1 rifle with a loaded clip but no live bullet in the chamber, a .30 caliber Marlin rifle, an AR–180 automatic rifle with a live round in the chamber and 29 live rounds in the magazine, four quart bottles of gasoline with wicks therein, known as "Molotov Cocktails", a live bomb, various live ammunition and spent ammunition casings on the floor. The first three of the above weapons were found in the bunker area and the other weapons under the house nearby.

The indictment was returned into the Jackson Division of the United States District Court for the Southern District of Mississippi. The appellants filed a motion to dismiss the indictment on the ground of excessive publicity. The Court overruled the motion, but *sua sponte* transferred the case to Biloxi in the same judicial district, where it was later tried.

*Sufficiency of Evidence and Indictment to Support Conspiracy Convictions*

All of the appellants contend that the evidence is insufficient to support any conviction under the conspiracy count. The principal grounds urged in support of this contention are: (1) the evidence did not show (a) any *agreement* to assault, intimidate or interfere with anyone, or (b) any "knowledge that federal officers would come in conflict with the essentially defensive precautions"; [15] or (2) any connection of any individual defendant with the conspiracy. In addition, they claim that the indictment fails to show any logical relationship between the offense alleged as the third object (unlawful possession of unregistered firearms required to be registered) of the conspiracy and the overt acts. We are of the opinion that there is no merit in any of the contentions except the one that the evidence is insufficient to show Ann Lockhart was a participant in the conspiracy.

The discussion of appellants in support of their contention would be more fitting for a jury argument. They take a view of the evidence most favorable to themselves; and, when evidence supporting the government's theory stands in their way, they insist that it is not credible. Other shortcomings in their contentions are that they assume that a conspiracy must be based on an express agreement; that it must be full and complete from the beginning; that it is not subject to

15. Quotation is from Stalling Brief, p. 22.

# 1010

change; and that each participant must have full knowledge of all its details.

All of the appellants except Ann Lockhart were "citizens" of the RNA. As such, they were working with and under the appellant Henry, the militant President of the RNA in the "capitol". They were members of his "underground army" and his "crack security guard." A poster on the wall in the "capitol" at the time of and for some time prior to the shoot-out stated: "Our most important gratuity is an intelligent underground army which, if the Republic is attacked will burn white America to the ground as mercilessly as a missile attack." Official pamphlets were also distributed among the "citizens" at the "capitol" on how to destroy city utility systems. The Jackson police served a warrant on Henry about a week before August 18; and he advised Police Lt. Skinner, the officer who was mortally wounded in the shoot-out, that the RNA would be ready for the officers the next time. An RNA official issued a press release stating that the RNA "heavily armed, crack security guard" could effectively slaughter several scores of officers. The "capitol" at Lewis Street was an armed fortress, with guns, ammunition, underground bunker, escape tunnel, holes in the foundations through which shots would be fired, and armed guards on duty at the entrance. Appellant Henry was 43 years old, but the other appellant RNA "citizens" were much younger. Most of them were around 20 and made eager members of the RNA "crack security guard." Preparations for a violent and deadly confrontation with law enforcement officers had been taking place for some time before the August 18 shoot-out. As has already been pointed out, much of the time of the three-day national meeting of the RNA in mid-July was devoted to "security" measures for RNA officers and property; and the caution was issued to be "warned of bad faith tactics which might come from local police." Henry

sometimes carried a rifle with a scope on it while in the "capitol" and a .45 automatic pistol when on speaking engagements elsewhere. The members of the security guard were also given karate lessons. The preparations at the "capitol" included "jump" drills, wherein each "citizen" there was taught to take a designated position with a loaded gun at an opening and shoot at objectionable intruders, especially law enforcement officers. This evidence and much more leaves no doubt that the appellant RNA citizens were participants in a plan to defy, intimidate and shoot it out with any law enforcement officers, federal or state, when the opportunity presented itself. The federal government was the one which they thought was standing in the way of their acquisition of the five southern states they were claiming. When the notice was given over a bullhorn on the morning of August 18 that FBI Agents and local police were at the Lewis Street "capitol", the "jump" command was given, and the "crack security guard" engaged in "combat-win procedures" that resulted in killing one Jackson policeman, wounding another one and an FBI Agent.[16]

The facts above stated, along with others included in the statement of the case at the beginning of the opinion, are adequate to establish a common plan among the appellants alleged as the basis of the conspiracy. The actions of the defendants themselves are always important circumstances from which to draw inferences of a conspiracy. *United States v. Warner*, 5 Cir., 441 F.2d 821, 830 (1971). The manner in which the appellants acted during the shoot-out on the morning of August 18 was strong evidence of a common plan and certainly showed concerted action. They did not go about things haphazardly in trying to carry out what some of the RNA "citizens" had called their "combat-win procedures". The evidence of a common plan or unlawful combination is much strong-

---

16. The words in quotations in the above paragraph are from statements of RNA officials from time to time prior to August 18.

er in this case than it was in many of the cases cited under this heading, where the evidence was held to be sufficient. There is no doubt that there was a common plan to defy, intimidate and shoot it out with any law enforcement officers when the opportunity presented itself.

 The following legal principles support the Court's holding that the evidence is sufficient to show the existence of the agreement or common design which formed the basis for the conspiracy alleged in the indictment. To establish the common plan element of a conspiracy, it is not necessary for the government to prove an express agreement between the alleged conspirators to go forth and violate the law. The "common purpose and plan may be inferred from a 'development and collocation of circumstances'." *Glasser v. United States,* 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704; *United States v. Harvey,* 5 Cir., 464 F.2d 1286 (1972), cert. den., 410 U.S. 938, 93 S.Ct. 1399, 35 L.Ed.2d 604. "A conspiracy is seldom born of 'open covenants openly arrived at.'" *Lacaze v. United States,* 5 Cir., 391 F.2d 516 (1968). "The proof, by the very nature of the crime, must be circumstantial and therefore inferential to an extent varying with the conditions under which the crime may be committed." *Direct Sales Co. v. United States,* 1943, 319 U.S. 703, 714, 63 S.Ct. 1265, 1270, 87 L.Ed. 1674, 1683. See also *Rodriguez v. United States,* 5 Cir., 373 F.2d 17 (1967). Knowledge by a defendant of all details or phases of a conspiracy is not required. It is enough that he knows the essential nature of it. *Blumenthal v. United States,* 1947, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154; *United States v. Musgrave,* 5 Cir., 483 F.2d 327 (1973), cert. den., 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315; *United States v. Quinn,* 2 Cir., 445 F.2d 940 (1971), cert. den., 404 U.S. 850, 92 S.Ct. 87, 30 L.Ed.2d 90; *United States v. Barone,* 3 Cir., 458 F.2d 1027 (1972). "And, it is black letter law that all participants in a conspiracy need not know each other; all that is necessary is that each know that

it has a 'scope' and that for its success it requires an organization wider than may be disclosed by his personal participation." *United States v. Edwards,* 2 Cir., 366 F.2d 853, 867 (1966), cert. den., 386 U.S. 908, 87 S.Ct. 852, 17 L.Ed.2d 782.

The appellants' claim that there is no evidence to show any "knowledge that federal officers would come in conflict with the essentially defensive precautions" is based upon the argument that some time before the shoot-out, the appellants claim that the "citizens" were instructed to avoid shooting at federal officers. The jury did not have to believe their claim; but even if it was true, inferences that such instructions were later abandoned or superseded could be drawn from the facts already detailed. The "combat-win procedures" were well planned and set up for the appellant RNA "citizens" to go into concerted violent action against any law enforcement officers when the "jump" command was given. They were eagerly awaiting the chance. A strong circumstance showing that federal officers were within the contemplation of the plan is that after the appellants at the Lewis Street "capitol" were advised in the loud tones of a bullhorn that FBI Agents were present to serve a federal warrant, the "jump" command was given and the "combat-win procedures" were put into action. If it had been a part of the plan not to use the "procedures" against federal officers, it is only logical to conclude that the command would not have been given and the plan would not have been put into effect when the appellants heard that FBI Agents were among the officers present and participating. There is no merit in this contention.

 The claims of each of the appellants that the evidence is insufficient to connect him or her with the conspiracy, if it was established, must be judged in the light of the legal principles that follow in this paragraph. Once the existence of a common scheme of a conspiracy is shown, slight evidence is all that is required to connect a particular defendant with the conspiracy. *United States*

*v. Warner,* supra; *Lopez v. United States,* 5 Cir., 414 F.2d 909 (1969). The connection may be shown by circumstantial evidence. *Lopez v. United States,* supra. "A person may be held as a conspirator although he joins the criminal concert at a point in time far beyond the initial act of the conspirators. If he joins later, knowing of the criminal design, and acts in concert with the original conspirators, he may be held responsible, not only for everything which may be done thereafter, but also for everything which has been done prior to his adherence to the criminal design . . . " *Lile v. United States,* 9 Cir., 264 F.2d 278, 281 (1958), quoted with approval in *Nelson v. United States,* 5 Cir., 415 F.2d 483 (1969); *Downing v. United States,* 5 Cir., 348 F.2d 594 (1965). The fact that a conspirator is not present at, or does not participate in, the commission of any of the overt acts does not, by itself, exonerate him. *United States v. Sutherland,* 5 Cir., 463 F.2d 641, 647 (1972).

A few conclusory comments based on the facts already set out will suffice in the discussion of the question of the sufficiency of the evidence to show the connection, or lack of it, of each defendant with the conspiracy. It would unduly lengthen this opinion to do otherwise.

■ *Henry.* He was the President of RNA. All of the "security" measures and "combat-win procedures" were planned and practiced under his direct supervision. He had made public threats of violence against law enforcement officers who might come to the "capitol". Within less than a month of the shoot-out, he held a meeting wherein instructions were given RNA "citizens" to shoot people, especially police officers and FBI Agents, who might try to intrude the "capitol". The shoot-out went according to the plan and procedure he had helped set up. While he was at the Lynch Street house to which the "capitol" was being moved, instead of the Lewis Street "capitol", at the time of the shoot-out, his presence and participation in the shoot-out were not necessary to support his conviction under the conspiracy count. *Posey v. United States,* 5 Cir., 416 F.2d 545, 556 (1969), and *United States v. Sutherland,* supra. In the *Posey* case, the killings within the contemplation of a conspiracy by members of the White Knights, "a self-styled militant organization", were carried out. The defendant who was the Imperial Wizard of the White Knights claimed that the evidence was insufficient to connect him with the conspiracy on the ground that he was not present at and did not participate in the killings. The court held that such proof was not necessary. So it is here. The overwhelming evidence shows that this tragedy would not have taken place except for the work of Henry.

*Norman.* He was Vice-President of RNA, and had been actively involved in RNA in Jackson for some time. He and President Henry designated the chain of command for the security forces. He assisted Henry in the RNA meeting in July when instructions were given to shoot intruders attempting to enter the "capitol", especially police and FBI Agents. He admitted just after the shoot-out that he was a participant in it. He said he was firing a British 303 gun from inside the house.

*James.* He held the title of Interior Minister of the RNA. He lived at the Lewis Street "capitol" for most of six weeks before August 18. He was a participant in the "combat-win procedure" drills. He was in charge of the arsenal of some 30 weapons and ammunition to be used in carrying out the common plan. It was his job to assign the weapons to members of the crack security guard. He discussed the bomb and the Molotov cocktails with such members and told them how to use them. He told the officers shortly after the shoot-out that he had shot at any white man he saw. His fingerprints were on the automatic rifle found under the house beside a pile of spent rounds after the shoot-out. He was one of the main actors in the conspiracy.

*Toni Rene Austin.* As Minister of Finance of the RNA, she was in charge of the treasury. She lived with her husband, appellant James, in the room in the back part of the "capitol" where the arsenal and ammunition for the security guard were kept. She did guard duty at the "capitol", and participated in the "jump" drills. On July 27, she wrote out a list of ammunition to be bought for use by the security guard. The ammunition was not purchased until the night before the shoot-out.[17] She was in the "capitol" when the officers made their announcements on the morning of August 18, but did not come out until forced by tear gas to do so after the shoot out.

*Shillingford.* He was a "citizen" of the RNA. He had come to Jackson a few days before the shoot-out to participate in the RNA activities at the "capitol". He stayed at the "capitol" and was an active "citizen" there. He was the one who went on the night of August 17 and got the ammunition which was on the list prepared by appellant Toni Austin on July 27. He was a member of the crack security guard, and fired an M–1 rifle from his station inside the west part of the "capitol" during the shoot-out.

*Stalling.* He was an active "citizen" of the RNA. He lived in the Lewis Street "capitol". He helped dig the escape tunnel which was to figure importantly in the security procedures when it was finished.[18] He did active guard duty at the "capitol" and participated in the "jump" drills. He took the female defendants to the escape tunnel during the shooting.

Under the circumstances, a reasonably-minded jury could well conclude be-yond a reasonable doubt that the conspiracy alleged actually existed, and that the appellants, Henry, Norman, James, Austin, Shillingford and Stalling, were each members of it. That leaves the question of the sufficiency of the evidence to connect Ann Lockhart with it.

 *Lockhart.* Her residence was in Wisconsin. She was not a "citizen" of RNA, but she obviously sympathized with its objectives. Her husband was appellant Norman, the Vice-President of RNA. She had spent over a month of the summer in Africa, and was not in Jackson for the People's Center Council in July. She arrived at the Lewis Street "capitol" on August 16, and stayed with her husband until after the shoot-out. On August 16 and 17, she purchased groceries and prepared meals for the occupants of the "capitol". Her stopover there was intended to be very short, as her plans were to leave for North Carolina on the morning of August 18. The evidence is insufficient to show that she had any knowledge of the conspiracy or participation in it. There is nothing in the record to justify making her responsible for her husband's unlawful conduct. Mere presence at the scene of a crime or mere association with the members of a conspiracy is not enough to prove participation in it. In *United States v. Webb*, 6 Cir., 359 F.2d 558, 562 (1966), where circumstances similar to those involving Lockhart here were present, the Court said:

"Defendant Stokely's unexplained presence during such a series of suspicious events might well justify grave doubts about her role. But neither association with conspirators nor knowl-

---

**17.** On the night of August 17, some 30 officers made plans to go to the "capitol" the next morning to serve arrest warrants. The following events also occurred on that night: (1) The fugitive, Steiner, left town unexpectedly around 11:00 o'clock. (2) A purchase order for ammunition for the security guard which had lain around for almost three weeks was executed. (3) President Henry did not stay at the Lewis Street "capitol" on that night. Whether the "citizens" of RNA had got wind of the plans for the officers' visit to the Lewis

Street "capitol" on the early morning of August 18 does not appear; but the possibility that the three occurrences above described were just coincidences seems somewhat remote.

**18.** The escape tunnel, which was to go from the Lewis Street "capitol" to a nearby house, had not been completed at the time of the shoot-out. The female defendants did go there during the shooting.

edge that something illegal is going on by themselves constitute proofs of participation in a conspiracy. *United States v. Falcone*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940); *United States v. Potash*, 118 F.2d 54 (C.A.2, 1941), cert. denied, 313 U.S. 584, 61 S.Ct. 1103, 85 L.Ed. 1540 (1941)."

The able trial judge realized the seriousness of this question, for, in his discussion of the sufficiency of the evidence to take the case to the jury, he said:

". . . [I] determine that there is substantial evidence upon which a jury might reasonably base a finding that the defendants are guilty beyond a reasonable doubt of the charges against them in the indictment although I have some questions in my mind concerning defendant Ann Lockhart, a/k/a Tamu Sanna . . . ."

The conviction of Ann Lockhart on Count I is therefore reversed.

There is no question about the sufficiency of the evidence to show the three overt acts alleged in the indictment: (1) The act of Henry during the latter part of July in instructing a group of citizens of the RNA to shoot any unknown person who approached the Lewis Street property of the RNA. (2) The acts of the defendants, James, Norman, Shillingford, Stalling and Jackson,[19] in having firearms in their possession on or about August 18. (3) The acts of defendants, James, Norman, Shillingford and Jackson, in firing rifles and carbines at federal officers on August 18.

▇▇▇ The appellants argue that all the conspiracy convictions ought to be reversed because the third object of the conspiracy (possession of unregistered firearms required to be registered) is not supported by the allegation of a relevant overt act. They say that overt act 2 charging that the defendants, James, Norman, Shillingford, Stalling and Jackson, had firearms in their possession on or about August 18 alleges a condition, rather than an act. They cite no authorities in point. The claim impresses us as being frivolous. There are numerous federal statutes that make the act of possessing specified objects a felony. In addition, even if appellants were correct in this contention, two other offenses are alleged as objects of the conspiracy, and there is no challenge as to their adequacy. It has always been the law that where an indictment alleges a conspiracy to commit several offenses against the United States, the charge is sustained by adequate pleadings and proof of conspiracy to commit any one of the offenses. *Hogan v. United States*, 5 Cir., 48 F.2d 516 (1931), cert. den., 284 U.S. 668, 52 S.Ct. 42, 76 L.Ed. 565; *Christiansen v. United States*, 5 Cir., 52 F.2d 950 (1931); *McWhorter v. United States*, 5 Cir., 62 F.2d 829 (1933); *United States v. Grizaffi*, 7 Cir., 471 F.2d 69, 73 (1972), cert. den. 411 U.S. 964, 93 S.Ct. 2141, 36 L.Ed.2d 684; *United States v. Papadakis*, 2 Cir., 510 F.2d 287, 297[20] (1975), cert. den., 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104; *United States v. Frank*, 2 Cir., 520 F.2d 1287, 1293 (1975). We are of the opinion that the convictions of all the appellants, except Ann Lockhart, under Count I are supported by the allegations of the indictment as well as by the evidence.

### Sufficiency of Evidence to Support Convictions under Counts II., III., IV.

The claim is made that the evidence is insufficient to support the convictions of the appellants, Henry, Norman, James and Shillingford, under Count II. (assault on federal officers while in performance of official duties), on the following grounds:

▇▇▇ 1. There is no proof that such appellants knew "who was outside or

---

**19.** Jackson is the defendant who was not tried with the appellants because he was a juvenile.

**20.** "Where a conspiracy has multiple objectives, a conviction will be upheld so long as evidence is sufficient to show that an appellant agreed to accomplish at least one of the criminal objectives . . . ." 510 F.2d, at 297.

what they were doing on August 18." [21] The inference could be drawn that those present did know from the announcements over the bullhorn that FBI Agents and Jackson policemen were there to serve arrest warrants on certain persons at the Lewis Street address. In addition, it is not necessary in prosecutions under 18 U.S.C. § 111 to show that the defendant knew that the person being assaulted was a federal officer, or that as such he was engaged in the performance of his official duties. *Pipes v. United States*, 5 Cir., 399 F.2d 471 (1968), cert. den., 394 U.S. 934, 89 S.Ct. 1207, 22 L.Ed.2d 464; *Burke v. United States*, 5 Cir., 400 F.2d 866 (1968), cert. den., 395 U.S. 919, 89 S.Ct. 1771, 23 L.Ed.2d 237.

■ 2. Henry claims that the evidence is insufficient to show he was an aider and abetter as alleged in Counts II. and III. (the use of firearms in the commission of a felony). The main fact urged as support for that argument is that he was at the Lynch Street provisional "capitol" at the time of the shoot-out at the Lewis Street "capitol", and therefore could not have come within the contemplation of 18 U.S.C. § 2. The authorities do not support that contention. The statute provides that whoever "aids, abets, counsels, commands, induces or procures" the commission of an offense against the United States is punishable as a principal. In prosecutions based on this statute, it is not necessary to prove that the defendant was present when the crime was committed or that he actively participated therein. *Collins v. United States*, 5 Cir., 65 F.2d 545 (1933); *Russell v. United States*, 5 Cir., 222 F.2d 197 (1955).[22] The evidence set out in the discussion of the conspiracy count is more than adequate to support the convictions of Henry under Counts II. and III.

3. Appellant James contends that the evidence is insufficient to support his conviction under Count IV. for unlawful possession of an unregistered firearm required to be registered. He urges as grounds for his contention that:

■ (a) The AR–180 rifle in question was not capable of automatic fire. The basis for that claim is that an FBI Agent was unable to make it fire automatically in a test conducted for the purpose of the trial in the fall of 1973. There is evidence to the effect that when FBI Agents first tested it shortly after the shoot-out, it did fire automatically. One of the FBI Agents present at the shoot-out recognized from the type of noise during the shooting that one of the guns being fired from inside of the building was an automatic. One of the first inquiries he made immediately after taking James and others into custody was, "Who was firing the automatic weapon?" After the test firing by federal agents following the shoot-out, the weapon passed into and remained in the hands of state officials for use in evidence against those persons who were charged with the murder of Police Lt. Skinner on August 18. The gun was the type which could be converted to semi-automatic by manipulation of some of its mechanism. From this evidence, the jury could conclude that the weapon was automatic when James was using it in the shoot-out, and that through some misuse after the first testing by federal officers, it became incapable of being fired automatically. The crucial question was whether the weapon was automatic at the time James was using it on August 18, 1971, and not its condition at the time of the trial of this case two years later.

■ (b) There was no proof that he knowingly possessed an automatic weap-

**21.** This statement is taken from page 78 of Norman's brief. The appellants have briefed the case under an arrangement that each brief is for all of them, where applicable.

**22.** " . . . There must exist a community of unlawful intent between the accessory and the perpetrator of the crime, but ' . . . an ac-

cessory is liable for any criminal act which in the ordinary course of things was the natural or probable consequence of the crime that he advised or commanded, although such consequence may not have been intended by him' . . . . It is not essential that the accessory know the modus operandi of the principal. . . . " 222 F.2d, at 199.

on. The record does not support this contention. James' fingerprints were on the automatic rifle when it was found in the Lewis Street building near a number of casings from recently fired cartridges. He admitted that he was the one who was firing the automatic rifle. It is difficult to understand how he can argue that he did not actually know he had an automatic weapon. However, even if he did not, the proof would be sufficient under the rule announced in *United States v. Vasquez,* 5 Cir., 476 F.2d 730 (1973).[23]

### Henry's Claim of Immunity from Prosecution

■ Henry, a native born citizen of the United States, claims that he enjoys immunity from prosecution in this country for crimes of the type here involved, because, as President of the RNA, he is a sovereign of a foreign nation. That contention is frivolous. The facts of this case do not entitle him to sovereign or diplomatic immunity. He has no license to commit murder or any other crimes in any part of the United States. The Court rejects Henry's arguments that RNA is a foreign country, and that his acts took place within the borders thereof.

### Legality of the Searches and Seizures

The appellants presented a motion to suppress the 13 guns, many live and spent cartridges, eight Molotov cocktails, bomb fragments, and pictures and posters which were seized in the searches of the RNA premises on Lewis and Lynch Streets. The grounds of the motion were: (1) The officers were not lawfully on the premises because they were using the federal arrest warrant for the fugitive Steiner as a pretext for gaining entry for a search, and because they had no probable cause for believing Steiner was there at the time. (2) The officers failed to give the notice of authority and purpose required by 18 U.S.C. § 3109.[24] (3) The plain view doctrine did not apply. (4) The scope of the search rendered it unreasonable.

The validity of the searches and seizures depended upon the right of the officers to enter the premises to execute a federal arrest warrant on the fugitive Steiner believed by them to be in the buildings searched, and on the exigencies of the circumstances that developed in the attempt to execute that warrant and the ones the Jackson police had. Those policemen were assisting the FBI in trying to arrest the fugitive, and were also there to execute misdemeanor arrest warrants for three persons they had reason to believe were on the premises. There was no search warrant.

■ The trial court overruled the motion to suppress after a full evidentiary pre-trial hearing which lasted two days, and filed a memorandum opinion setting out findings of fact and conclusions of law. *United States v. James, et al.,* S.D.Miss., 408 F.Supp. 527 (1973). Those findings are binding on this Court unless they are clearly erroneous. *United States v. Gunn,* 5 Cir., 428 F.2d 1057 (1970). Our careful review of the record reveals that the findings are justified by the evidence and are therefore not clearly erroneous.

The evidence offered on the hearing of the motion was developed in full again in the trial on the merits. The scope of the evidence on the motion was such that it would support most of the factual statements in this opinion. The narrative statement of facts in the trial court's published memorandum opinion is

**23.** "[W]e hold that the Government was not required to prove that the defendant had knowledge that the physical characteristics of the weapon rendered it subject to registration. Scienter is established if the defendant be proved to have had knowing possession of an item which he knew to be a firearm, within the general meaning of that term" 476 F.2d, at 732.

**24.** 18 U.S.C. § 3109.

"The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

comprehensive and complete, and the findings will be set out in summary form here.

■ The trial court found that on the occasion in question the FBI had an arrest warrant for a fugitive, Steiner, and the Jackson police had three misdemeanor arrest warrants; that all of the warrants were valid and outstanding; that the officers reasonably believed, based upon reliable, corroborated information, that the subjects of the arrest warrants were in the RNA premises; that the attempt to execute the warrants was in good faith and not pretextual; that the FBI Agents gave notice of authority and purpose which met the requirements of 18 U.S.C. § 3109; that the officers were reliably informed that the RNA was a violence-prone organization, particularly hostile to law enforcement officers and that the fugitive was a dangerous man; that the entries and searches were for the purposes of looking for the fugitive Steiner and two of the alleged misdemeanants who had not been located, of discovery whether any one who might be left in the house was wounded and needed attention, and of security of themselves during the remainder of the time they were on the premises in performance of their duties; that the articles seized were in plain view of the officers while they were lawfully in the buildings and were performing their official duties.

■ We agree with the trial court's holding that the searches and seizures were reasonable and valid. A search warrant was not necessary to execute an arrest warrant on the premises of a third party; "and although the person sought is not in the dwelling the actor is privileged to use force if he reasonably believes him to be there and enters in the exercise of a privilege to make a criminal arrest under a valid warrant. . . ." *Rodriguez v. Jones*, 5 Cir., 473 F.2d 599, 606 (1973), cert.

den., 412 U.S. 953, 93 S.Ct. 3023, 37 L.Ed.2d 1007; *United States v. Jones*, 5 Cir., 475 F.2d 723, 729 (1973); *United States v. McKinney*, 6 Cir., 379 F.2d 259 (1967).[25] The officers' information from an informant whom they had previously found to be reliable that the fugitive was at the premises in question was an adequate basis for a reasonable belief by them that the suspect was there. *Rodriguez v. Jones,* supra. The announcement by the FBI Agents over the bullhorn of the authority and purposes of the officers present, while standing in plain view in daylight at the RNA premises, which was repeated the second time, fully satisfied the requirements of 18 U.S.C. § 3109. It was not required that the occupants of the house verbally or affirmatively refuse to respond to the officers' demand. Failure to respond within a reasonable time was tantamount to a refusal. A reasonable time is ordinarily very brief. *Rodriguez v. Jones,* supra, at page 607, fn. 5. In addition to the right of the officers to enter the premises for the purpose of executing the arrest warrants, they had a right as officers to enter for security checks for the safety of themselves and others. *United States v. Looney*, 5 Cir., 481 F.2d 31 (1973); *United States v. Miller*, 145 U.S.App.D.C. 312, 449 F.2d 974, 977 (1971); *United States v. Holiday*, 3 Cir., 457 F.2d 912, 914 (1972), cert. den., 409 U.S. 913, 93 S.Ct. 246, 34 L.Ed.2d 175. After the officers entered the house, they had the right to seize relevant articles in plain view while carrying out those purposes. *Harris v. United States*, 1968, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067; *Coolidge v. New Hampshire*, 1971, 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564; *Looney, Miller* and *Holiday*, all supra. The fact that the persons being looked for were not in the house did not render the entry invalid nor require suppression of evidence seized while in plain view. *United States v. Hofman*, 5 Cir., 488 F.2d 287 (1974). The scope of the search

---

**25.** An arrest warrant and " . . . the inherent mobility of the suspect, would justify a search for the suspect provided the authorities reasonably believe he could be found on the premises searched. . . ." 379 F.2d at 263.

was tied to and justified by the exigencies of the situation. *United States v. Barone*, 2 Cir., 330 F.2d 543 (1964), cert. den., 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053; *United States v. Briddle*, 8 Cir., 436 F.2d 4 (1970), cert. den., 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 24; *United States v. Miller, supra.*

There is no merit in the appellants' claim that the evidence in question was inadmissible.

### Admissibility of Extrajudicial Statements

Appellants, James, Norman, Shillingford and Austin, claim that certain statements made by them in answer to brief questioning by an FBI Agent while still on the premises shortly after the shooting were inadmissible. Agent Amann testified on the trial that Norman and Shillingford each said they fired a weapon from inside the Lewis Street building, and that James said he fired the AR–180 rifle from there at any white man he saw. He further testified that Austin, Lockhart and Stalling each said they went underground and did not fire any weapons. Each appellant challenged the admissibility of his statement by pre-trial motion to suppress and by objection at the time evidence of it was offered on the trial. They claim that the trial court erred in ruling the evidence admissible because (1) there was no valid waiver of their *Miranda* rights, and (2) the statements were involuntary as a matter of law because they were made at the scene so shortly after the shooting.

The hearing on the pre-trial motion to exclude the statements was held in advance of the trial in connection with the hearing on the motion to suppress the fruits of the search. The trial court's findings of fact and conclusions of law appear in a memorandum opinion filed shortly after the hearing. The findings are not clearly erroneous, and they are therefore binding on this Court. *United States v. Ogle*, 5 Cir., 418 F.2d 238 (1969); *United States v. Montos*, 5 Cir., 421 F.2d 215, 219 (1970).

During a pause in the shooting at the Lewis Street premises after about 20 minutes of gunfire, one of the appellants shouted, "Don't shoot. We are coming out." Shortly thereafter, the seven appellants came out of the fortified bunker [26] under the building and surrendered to the officers. One of the FBI Agents took them into custody for assault on a federal officer. The officers did not know how many people were in the building during the shoot-out; and, as the appellants came out, the officers asked a few questions to try to determine if anyone was still in the building. They were especially fearful of further fire from the automatic weapon if anyone who might be left in the house could shoot it. When the appellants came out of the bunker, Agent Amann asked them collectively who fired the automatic weapon. James said he did. He then asked them who else fired weapons; [27] and Norman said, "We all did." No Miranda warning had been given when these statements were made, as the concern of the officers at that time was safety and not gathering evidence. Evidence as to these questions and answers was never offered or admitted.

When all seven appellants were taken into custody, the FBI took them down the street about 100 yards from the "capitol", and they took seats on the curb there. Agent Holder then gave them the *Miranda* [28] warning in the presence of Agent Amann. Each one said that he understood the rights. Agent Amann then asked each of the appel-

---

26. The bunker resembled a cellar dug in the ground. It could be entered from the house through a trap door. It connected with the unfinished escape tunnel.

27. The reason for this inquiry is obvious. The officers knew the positions in the building where the shots had come from. If they could find out how many shooters they had in custody, the location in the building they had been shooting from, and the type of weapon being used there, the information would help them to know whether they had all the shooters in custody.

28. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

lants an average of three questions. No officer had yet gone into the RNA Lewis Street building and the primary concern was still the personal safety of the officers. One of their comrades was dead and two were seriously wounded; and Steiner, the man regarded as the most dangerous of all persons who might be in the building had not yet been located. The following answers were given to Amann's questions: Norman said he had fired a British 303 rifle out of the house from the front, back and east sides. Shillingford replied that he had fired an M–1 rifle from the interior of the west side. James stated that he had fired the AR–180 automatic weapon from the front, back and both sides, shooting "at any white person I could see." Jackson responded that he had fired a 30–06 rifle out of the west side. Stalling said that he was not involved in firing the weapons, as he took the two female appellants, Toni Austin and Ann Lockhart, to safety in the bunker under the building. Austin and Lockhart denied firing any weapons. The motion to suppress the evidence as to these statements, as well as objections to its admissibility at the trial, were overruled, and the evidence was admitted.[29]

█ The appellants do not question the adequacy or correctness of the warning given. Their contention in regard to the warning is that the government did not sustain its heavy burden of proving an implied waiver of their rights before they made the statements admitted in evidence. They say that the existing circumstances precluded an implied waiver, and made an express waiver necessary as a matter of law. We are of the opinion that an express waiver was not necessary, and that the question of whether each of the appellants made a voluntary and understanding implied waiver of his or her rights was a question of fact. The general rule is that neither a written nor an oral express waiver is required. *United States v. Montos,* 5 Cir.,

421 F.2d 215, 224 (1970), cert. den., 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532; *United States v. Daniel,* 5 Cir., 441 F.2d 374 (1971). To discharge its heavy burden of showing an implied waiver, "All that the prosecution must show is that the defendant was effectively advised of his rights and that he then intelligently and understandingly declined to exercise them." *United States v. Montos, supra,* at p. 224.

Immediately after the *Miranda* warning was given, each one of the persons then in custody expressly acknowledged that he understood it. This is not a case where the persons accused were of low level intelligence, caught by surprise in a type of situation they had never anticipated. Norman had a degree from Rutgers University and two semesters of graduate work. Lockhart was in the last semester of her senior year at a university. Shillingford had three years of university work; James, two and one-half years; and Austin, one year. Some of them had had experience in teaching. They had sought and apparently enjoyed a violence-prone atmosphere. The RNA discipline was strict, and was enforced by belt whippings and other forms of punishment. The violent confrontation with officers was not something unexpected. The record justified the conclusion that the appellants, with the exception of Ann Lockhart, not only had prepared for such a confrontation, but had looked forward to it.

The appellants who made the statements were not taken off one at a time for questioning by officers. They were interviewed together. There was no grilling. The questioning of each appellant lasted only about two minutes. The type of questions, as has already been indicated, was whether the individual had been involved in firing any shots, and, if so, what part of the house the shots were fired from, and what kind of a gun was used. No shooting was going on at the time. There was no indication

---

**29.** Testimony as to Jackson's statement was not received in evidence. It was never offered, as he was one of the two named defendants who was not tried with the appellants.

that any of them were upset or in distress. They had the appearance of being mentally alert, and they spoke in normal, audible voices. There is no claim by the appellants that any of them was suffering from any remorse.

■ There was no reluctance to answer the questions. There was no indication that any of the appellants wanted a lawyer at that time. The refusal by some of the appellants at a later time to sign a written waiver does not automatically, as the appellants claim, preclude the finding of an intelligent and understanding waiver of the *Miranda* rights. *United States v. Hopkins,* 5 Cir., 433 F.2d 1041, 1044 (1970), cert. den., 401 U.S. 1013, 91 S.Ct. 1252, 28 L.Ed.2d 550.

■ The appellants' final claim is that the statements should have been excluded because they were tainted by those made prior to the time the *Miranda* warnings were given. The only appellants who made such statements were James[30] and Norman. The statements were never ruled inadmissible, but they were never offered. We do not pass on the admissibility of those statements, because we are convinced that they did not taint subsequent statements which were admitted in evidence. The facts already stated show a freedom of mind on the part of each appellant that would preclude the conclusion that his statements made after the *Miranda* warning were infected by the earlier statements of Norman and James. *Rogers v. United States,* 5 Cir., 330 F.2d 535, 540 (1964), cert. den., 379 U.S. 916, 85 S.Ct. 265, 13 L.Ed.2d 186; *Thomas v. United States,* 5 Cir., 377 F.2d 118 (1967), cert. den., 389 U.S. 917, 88 S.Ct. 246, 19 L.Ed.2d 273.

There is ample support in the record for the trial court's findings that the *Miranda* warning was timely and properly given; that each appellant who made a statement clearly understood the *Miranda* rights, and voluntarily, intelligently and understandingly impliedly waived them; and that the statements in question themselves were voluntarily and understandingly made. There was, therefore, no error in admitting them in evidence.

### Speedy Trial

■ The trial court overruled appellants' motion to dismiss for lack of a speedy trial after an extended evidentiary hearing which covers 169 pages in the transcript, and made complete findings of fact and conclusions of law. The offenses were committed on August 19, 1971. The indictment was returned on October 22. The appellants were arraigned on December 7. The trial on the merits began in August, 1973. From a time shortly after the indictment until June 18, 1973, the deadline date for filing motions finally set by the Court, there was a constant barrage of defense motions and hearings thereon. Some of the hearings took as long as the average trial. During this same period, several of the appellants were facing state court charges for the killing of one Jackson police officer and the wounding of another during the August 18 shoot-out. With the hearings on the motions and the trial of that case added to the hearings on pre-trial matters here, defense counsel were keeping two courts busy. There were 148 docket entries of various defense motions, affidavits and orders on such motions. Not one of them related to a speedy trial. The reason is evident to one experienced in defense of criminal cases. It was to the interest of the defendants to let the case "cool off". While the failure to demand the right of a speedy trial no longer arbitrarily precludes an accused from asserting that he was denied that right, "that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker v. Wingo,* 1972,

---

**30.** The reference is to the answers of James and Norman set out earlier herein to questions by the FBI Agents as such appellants were surrendering after coming out of the bunker.

In response to the question about who fired the automatic weapon, James said that he did. In answer to the question as to who else fired weapons, Norman replied, "We all did."

407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101; *Turner v. Estelle*, 5 Cir., 515 F.2d 853. These cases hold that courts must necessarily approach speedy trial cases on an ad hoc basis. The delay was not purposeful or oppressive on the part of the prosecution, and there was no prejudice to the appellants. In itself, the length of delay does not prove violation of the right to a speedy trial. *Turner v. Estelle*, supra, at p. 856. The only defendants who were incarcerated during the delay were those who were being held on state court charges. The trial court correctly concluded that the constitutional right of the appellants to a speedy trial was not violated.

### Venue

The appellants contend that the *sua sponte* transfer by the trial court of the case from the Jackson Division of the United States District Court for the Southern District of Mississippi to the Biloxi Division of the same District violated their Sixth Amendment right to be tried by an impartial jury of the state and district wherein the crimes were alleged to have been committed. The venue provision of the Sixth Amendment[31] provides only for trial in the *district* where the crime shall have been committed. There is no reference to a division within a judicial district. Rule 18, F.R. Crim.P.[32] says that unless it is otherwise provided by statute or a Rule of Criminal Procedure, the trial shall be held in the district where the offense was committed. Authority is given the court to fix the place of trial within the district with due regard for the defendant and his witnesses. The division of a federal judicial district is not a unit of venue in criminal cases. *Bostick v. United States*, 5 Cir., 400 F.2d 449, 452 (1968);[33] *United States v. Addonizio*, 3 Cir., 451 F.2d 49, 61 (1972), cert. den., 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812.

Prior to the transfer the appellants had filed a motion to quash the indictment on the ground of excessive publicity in Jackson. At the conclusion of the hearing thereon, the Court overruled the motion with the comment that while there had been widespread publicity in the Jackson area, some of which had been adverse to the appellants, he felt that it had not been sufficient to require a dismissal of the indictment. He then proceeded to say:

"However, having due regard to the convenience of the Defendants and the witnesses, four of the Defendants being incarcerated at Parchman, in the State Penitentiary up in the northern part of Mississippi, and all except the Defendant, Imari Obadele residing outside the State of Mississippi, I am out of an abundance of precaution and in order to more nearly insure a fair trial for the Defendants and enable the jury to be selected which could try this case based solely on the evidence and the law, within my sound discretion, going to transfer this case to the Southern Division of Mississippi in accordance with the caveat of the Court in the *Sheppard* case in which the Supreme Court stated that the Court should certainly transfer a case to another county or area where the Defendant would be better afforded a fair trial."

---

**31.** Amendment VI. to Constitution of United States.

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."

**32.** Rule 18, F.R.Crim.P.

"Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed. The court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses."

**33.** "The recent amendments had the effect of eliminating the division as a unit of venue in criminal cases. It remains as an administrative unit in those districts which are subdivided by law into divisions. However, the division has no constitutional significance; the vicinage is the district . . . ." *Bostick*, 400 F.2d, at 452.

The amendments referred to were the ones to Rule 18, F.R.Crim.P., in 1966.

Under these circumstances, it is difficult to understand how the appellants can claim that the case should have been tried in Jackson.

### Jury Selection System

 The appellants made the claim in a pre-trial motion that the jury selection system in the United States District Court for the Southern District of Mississippi was constitutionally defective because it resulted in the exclusion of blacks from jury service. The trial court overruled the motion after a hearing. The jury selection system was in accordance with a plan approved by the Judicial Council of the Fifth Circuit. The source of names for the jury pool was the voter registration list of each county in the Division. Names for the jury pool were drawn therefrom at random in accordance with the plan. The fact that the names of some persons eligible to vote did not get on the lists on account of their failure to register did not make the jury selection plan constitutionally invalid, as it did not result in the exclusion of a cognizable group or class of citizens. *Grimes v. United States,* 5 Cir., 391 F.2d 709 (1968), cert. den., 393 U.S. 825, 89 S.Ct. 87, 21 L.Ed.2d 96. Those not registering did not comprise a cognizable group or class. *Camp v. United States,* 5 Cir., 413 F.2d 419 (1969); *United States v. Dangler,* 5 Cir., 422 F.2d 344 (1970). The jury selection system challenged here closely resembled the one which this Court upheld in *Simmons v. United States,* 5 Cir., 406 F.2d 456 (1969). See also *Thompson v. Sheppard,* 5 Cir., 490 F.2d 830 (1974).

### Conduct of Judge

 The Judge's questions and comments challenged by the appellants indicated only a fair and objective effort to clarify the testimony and expedite the trial. The brief [34] that discussed this question says that the questions complained of were usually of the "who?" and "what?" nature. With seven defendants on trial, questions of that type were almost unavoidable. The Court had to be sure that he and the jury were getting the proper understanding of the testimony as to the actions of each of them. The prosecution called 26 witnesses and the defense, 27. Each appellant had his own lawyer, and each one of them examined the witnesses. The appellants and some of their counsel bitterly felt that they were being tried by an agency of a government which was an interloper in Mississippi. Through it all the Judge maintained his dignity and composure. In appraising the conduct of a trial judge whose fairness is being questioned on appeal, the Court will consider the record as a whole, and not just the isolated parts objected to. *United States v. Penner,* 5 Cir., 425 F.2d 729, 730 (1970). The Judge instructed the jury in his main charge that they were the sole judges of the facts and were not to be influenced by his questions or statements during the trial. We are convinced that the Judge made every effort to see that the appellants got a fair trial, and that he accomplished that purpose. There is no merit in the appellants' attack on the conduct of the Judge. *Kowalsky v. United States,* 5 Cir., 290 F.2d 161 (1961); *United States v. Gower,* 5 Cir., 447 F.2d 187, 191 (1971); *United States v. Esse,* 5 Cir., 468 F.2d 1070 (1972); *United States v. Cassell,* 7 Cir., 452 F.2d 533, 537 (1971); *United States v. McCarthy,* 2 Cir., 473 F.2d 300, 307 (1972).

### Discovery

 The appellants claim that they were denied Jencks Act [35] and *Brady* [36]

---

**34.** Brief of appellant Henry, p. 24. The points which affected all the appellants were distributed among the seven of them, in order to avoid repetition, with the understanding that each brief would inure to the benefit of all of them.

**35.** 18 U.S.C. § 3500.

**36.** *Brady v. Maryland,* 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

material due them. That claim is based in substantial part on the refusal of the prosecution to make available to the defense certain FBI reports. Those reports were examined by the trial court *en camera,* and the government's position was sustained. The reports were sealed and sent to this Court as part of the record on appeal. A review of them and the record convinces us that no rights of the appellants under the Jencks Act or under the Brady rule were violated.

### Stalling's Sentence

The appellant Stalling claims that his sentence should be set aside because the trial court (1) did not require a pre-sentence report, and (2) did not make a finding that he would not benefit from treatment under the Federal Youth Corrections [37] Act.

■ The trial court did not abuse its discretion in proceeding to sentence Stalling without a pre-sentence report. *United States v. Deas,* 5 Cir., 413 F.2d 1371 (1969); *Lantz v. United States,* 5 Cir., 417 F.2d 329 (1969). Stalling was tried and convicted only on the conspiracy count, and his sentence was five years. The appellants had spent many days in court before the Judge who tried the case and imposed the sentences. The Court had heard voluminous evidence. No abuse of discretion appears in the failure to require a pre-sentence report.

■ Stalling was 20 years old at the time of the sentencing. The Judge failed to find that he would receive no benefit from treatment under the Youth Corrections Act. That failure was probably due to the fact that Stalling was sentenced several months before the decision in *Dorszynski v. United States,*

1974, 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855. That case holds that where a court imposes on a person eligible to being sentenced under the Federal Youth Corrections Act a sentence under other applicable penal statutes, the record must show that the judge considered the option of the Act's treatment and rejected it. It further holds that compliance with the Act may be shown by any expression in the record which makes clear such consideration and rejection, and that the reasons for the court's decision need not be given.[38]

There are no cases in this Circuit where the Court has discussed the retroactivity of the *Dorszynski* rule. In *Hoyt v. United States,* 5 Cir., 502 F.2d 562 (1974), the rule was applied, without comment on the retroactivity question, to a sentence which had become final. Courts in other federal circuits have held the rule not to be retroactive. *Jackson v. United States,* 10 Cir., 510 F.2d 1335 (1975); *Owens v. United States,* M.D.Pa., 383 F.Supp. 780 (1974), affirmed, 3 Cir., 515 F.2d 507; *United States v. Hamilton,* W.D.Mo. (1975), 391 F.Supp. 1090. We mention this only to make clear that we are not passing on the retroactive question here. The *Dorszynski* case was decided after Stalling had been tried and sentenced, but while his appeal was pending. He raised the question in his brief. In a similar situation in *United States v. Fonseca,* 5 Cir., 497 F.2d 1384 (1974), this Court remanded the case for resentencing under the guidelines of *Dorszynski.* In an opinion handed down shortly before the Supreme Court decision in *Dorszynski,* this Court held against Fonseca's contention that the trial court should have explicitly found that he would not benefit from treatment under the Act. *United States v.*

---

**37.** 18 U.S.C. § 5010.

**38.** "Judge Marvin E. Frankel (SDNY) has recently stated that while judges are required to explain other rulings, see, e. g., Fed.Rule Civ.Proc. 52(a), '[t]here is no such requirement in the announcement of a prison sentence.' Frankel, Lawlessness in Sentencing, 41 U.Cin. L.Rev. 1, 9 (1972). It would have been a very simple matter for Congress to have included a statement in § 5010(d) that the sentencing

court's determination of no benefit must be supported by reasons, as was required by the proposal regarding adult offenders, before the Congress in 1943, S. 895, Tit. 11, § 1, 78th Cong., 1st Sess. See n. 8, *supra.* Congress' failure to so provide in § 5010(d) strengthens our view that it intended no new appellate encumbrance upon the sentencing process." Fn. 15, 418 U.S., at 442, 94 S.Ct. at 3052, 41 L.Ed.2d, at 867.

## 1024

*Fonseca,* 5 Cir., 490 F.2d 464, 471 (1974). The Supreme Court decision came down while Fonseca's appeal was pending on motion for rehearing, and this Court ruled:

> "In view of the Supreme Court's recent decision in *Dorszynski v. United States,* 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974) relative to the sentencing requirements to be met by the district court under subsection 5010(d) of the Federal Youth Corrections Act, 18 U.S.C. § 5005, et seq. petitioner Fonseca's petition for rehearing is granted to the extent that the matter is remanded for resentencing under the guidelines of *Dorszynski.* In all other respects the petition is denied." 497 F.2d 1384.

Stalling's sentence is vacated and his case is remanded only for resentencing under the guidelines of *Dorszynski.* The remand is for that purpose only, as the conviction is not disturbed.

### Other Points

 Detailed discussion of all the remaining points would result only in lengthening this already too long opinion. We have carefully considered such points and find them to be without merit. This was a difficult case to try for many reasons. The appellants were entitled to a fair trial, not a perfect one. *United States ex rel. Weber v. Ragen,* 7 Cir., 176 F.2d 579, 586 (1949); *Estes v. United States,* W.D.Tex., 254 F.Supp. 314, 333 (1966), and cases cited therein. The record in this case leaves no doubt that the appellants got a fair trial.

Ann Lockhart's conviction is reversed and her case is remanded for further proceedings consistent with this opinion. All other convictions are affirmed. The sentence of appellant Stalling is vacated and his case is remanded only for resentencing under the guidelines of the *Dorszynski* case.

